(C. D. 1410)

M. & D. MILLER, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 29, 1952)

*Barnes, Richardson & Colburn (J. Bradley Colburn* and *James F. Donnelly* of counsel) for the plaintiff.

*Charles J. Wagner,* Acting Assistant Attorney General (*William J. Vitale,* special attorney), for the defendant.

*Lamb & Lerch (David A. Golden* of counsel) as *amici curiae.*

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

JOHNSON, Judge: This action involves the classification of earthenware teapots imported from England. The plaintiff claims that the teapots in question are known in the trade and commerce of the United States as Rockingham earthenware and, therefore, they are properly dutiable under the *eo nomine* provision therefor in paragraph 210, Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, T. D. 49753, at 12½ per centum ad valorem, rather than as decorated earthenware under paragraph 211, Tariff Act of 1930, at 50 per centum ad valorem and 10 cents per dozen pieces.

The merchandise is described upon the invoice of R. Sudlow & Sons, Ltd., as "Wed Two White Bands Mott. DECORATED ROCK/ MANGANESE GLAZE" and as "Band and Line Mottled." It was also declared upon the invoice that the foregoing described merchandise was "made of non-vitrified absorbent body, composed of natural red clay; that the body is covered in part by body slips composed of china clay, flint and stone—not artificially coloured."

At the trial 14 exhibits were admitted in evidence. Exhibits 1 and 2 represent the imported teapots in question. These teapots are colored a coffee brown with slightly darker spots, giving a mottled effect. Exhibit 1 has two tan-colored bands around the upper portion of the teapot. These bands are also mottled with a darker shade. The bands are slightly raised above the body of the teapot, indicating that other clay has been added or, as it is called, a body slip has been applied over the red body. Exhibit 2 has one narrow slip band and then upon the upper portion of the teapot the same clay has been superimposed. It also has a mottled tan appearance.

Illustrative exhibits A and B are banded teapots but more of a chocolate color. The color of the bands is dark tan and these bands also are slips of another clay added. These teapots, although slightly darker than exhibits 1 and 2, are not mottled. It was agreed between counsel that illustrative exhibits A and B represent teapots classified as Rockingham earthenware.

Illustrative exhibit C is a little darker in color than exhibits 1 and 2 but is lighter than illustrative exhibits A and B. This teapot also is mottled. It has two cream-colored bands, slightly mottled, and three narrow bands or lines which are about the color of the bands on exhibits 1 and 2 but a different color from the wider bands on the teapot, indicating that there were slips of different clays applied to the pot.

Illustrative exhibit D is dark chocolate in color, having a gold handle and spout, and the upper portion of the body is decorated with gold which, in addition, has a figure of a vine and conventional figures in a dull gold applied thereon.

Illustrative exhibit E is a dark-chocolate color, the upper portion being decorated with a vine effect similar to illustrative exhibit D but having the conventional decoration thereon containing dots in red, white, and blue, the remainder of the design being in what appears to be a dull gold.

Illustrative exhibit F is colored light green, having a gold base, handle, and spout, and with crinkled lines extending around the green body portion.

Illustrative exhibit G is of a plain blue-green color inside and out.

Illustrative exhibit H is dark brown in color and it has white streaks throughout the pot. All of the foregoing teapots are composed of a red-clay body. The remainder of the exhibits are not of red clay.

Illustrative exhibit I is decorated similar to illustrative exhibit F, having crinkled lines of gold extending around the yellow, glazed body and with a gold spout and partly gold handle. The body, however, is composed of pure white earthenware.

Illustrative exhibit J, the first of defendant's exhibits, is a teapot having a golden-brown glaze, different in color from any of the other

teapots. The glaze is placed upon a buff-colored earthenware body.

Illustrative exhibit K is a broken piece of a similar body to show the color of the clay.

Exhibit 3, placed in evidence in rebuttal on behalf of the plaintiff, consists of an order of the Robinson Clay Product Co. of New York City from Justin Tharaud & Son, Inc., for banded Rockingham teapots, item numbers 30–Y, 36–Y, 42–Y, and 48–Y.

It was orally stipulated and agreed between counsel for the plaintiff and counsel for the Government that—

\* \* \* the body of the teapot represented by Illustrative Exhibit A and the body of the teapots represented by Exhibits 1 and 2 is the same; that there is no distinction either in composition of the clay or in the method of manufacturing teapots represented by Exhibits 1 and 2 and Illustrative Exhibit A until after the first firing, when the teapots are in the "biscuit" stage; the teapot represented by Illustrative Exhibit A is then dipped into a Rockingham glaze (manganese stain), while the teapots represented by Exhibits 1 and 2 described on the invoice as "mottled" are dipped into a transparent glaze; and before it becomes dry a Rockingham glaze (manganese stain) is applied by sponge to produce the mottled effect.

Five witnesses testified on behalf of the plaintiff, and four witnesses testified on behalf of the Government. Counsel for the plaintiff conceded that the teapots in question were not embraced within the common meaning of the term "Rockingham earthenware."

Plaintiff's first witness, Morris Katz, is the vice president of Marks & Rosenfeld, Inc., importer of all kinds of English merchandise, including Rockingham ware. He had been selling Rockingham ware for 30 years and has been a buyer of such ware for 15 years. He had sold at wholesale teapots similar to exhibits 1 and 2 as Rockingham ware in practically every city in the United States. He had also sold teapots similar to illustrative exhibits A, B, C, D, E, F, G, and H as Rockingham ware, and he knew that illustrative exhibits A, B, E, and H had been classified by the collector as Rockingham ware.

Plaintiff's second witness, Elmer E. Proctor, managing director of Metasco, Inc., was formerly a buyer for Jordan Marsh Co. from 1930 to 1945, and previous to that time, a buyer for James McCreery & Co. for several years. For James McCreery, he bought Rockingham ware teapots at wholesale in the United States and later had bought such teapots for Jordan Marsh abroad, and for Metasco, Inc., a subsidiary of Allied Stores Corp., with members in Boston, Minneapolis, Florida, Texas, and Seattle, but sales thereof were made only at retail. His purchases of Rockingham ware teapots were similar to the teapots represented by exhibits 1 and 2 and illustrative exhibits A, B, C, D, E, F, G, and H. He had purchased at wholesale in the United States teapots similar to most of the exhibits prior to June 17, 1930, as Rockingham ware. He had bought abroad similar types as Rockingham ware, but he had not sold.

Plaintiff's third witness, George E. Minard, manager of the Atlas China Co., and previously a buyer for Stern Bros., made purchases in the United States at wholesale from Maddock & Miller, Justin Tharaud & Son, Inc., and Edward Boote. He also made direct importations from England from 1919 to 1939 and had personally made 25 trips to England as a wholesale buyer of Rockingham ware. He had purchased at wholesale in the United States and abroad Rockingham ware teapots similar to exhibits 1 and 2 and illustrative exhibits A, B, C, D, E, and F. The purchases were made at wholesale and the items were all bought as Rockingham ware teapots. He had not purchased teapots represented by illustrative exhibits G or H. All of his purchases were made at wholesale for sale at the retail level.

The plaintiff's fourth witness, Donald M. Miller, vice president of the plaintiff corporation, M. & D. Miller, Inc., testified that his firm had been in business only since 1937, but the parent company, Maddock & Miller, of which he is also vice president, is an importer of china and earthenware, including Rockingham ware. To his knowledge, Maddock & Miller has been importing Rockingham teapots since 1896, and from 1916 he has personally handled such merchandise. He had traveled over the entire country, particularly from Richmond, Va., to New Orleans, La., and from the east coast to the Mississippi River, and to Chicago, Boston, and Philadelphia, selling Rockingham ware, and he had personally met buyers from all over the United States including the Pacific coast, not only before June 17, 1930, but right up to the present time, and the company salesmen cover all the large cities in the United States and some of the small ones. He had purchased teapots similar to exhibits 1 and 2 and illustrative exhibits A, B, C, D, E, F, G, and H prior to June 17, 1930, and had sold at wholesale all over the United States in very large quantities, and such merchandise was purchased and sold as Rockingham ware.

The plaintiff's last witness, Justin Tharaud, president of Justin Tharaud & Son, Inc., importer of china and earthenware since 1922, testified he has been importing Rockingham ware from Sadler & Sons, Ltd., Burslem, England, and acts as its sole agent in the United States. He had not purchased or sold teapots prior to 1945, but since that time, he has sold in practically the entire United States, particularly or chiefly, however, in New England, the Midwest, the far West, and the East, the weakest point of sale being in the South. He had sold teapots similar to all the exhibits, except A and H. The teapots were sold as banded Rockingham ware and, in discussing the teapots, he referred to them as decorated Rockingham ware, and when a particular item was invoiced, it had a number and a shape or a name. He stated that illustrative exhibit I was his own teapot, a number 882 Golden Vermicelli, and illustrated an earthenware teapot, not Rockingham ware.

All of the plaintiff's witnesses disagreed with the common meaning of the term as applied to Rockingham ware as defined in the case of *Butler Brothers* v. *United States*, 4 Cust. Ct. 120, C. D. 303. Nor did they entirely agree with the commercial meaning of the term that the court held applied to teapots of Rockingham ware. Their main disagreement was that the commercial meaning was there apparently restricted to teapots only which varied in color from brown to black, although comprehending samian ware, the' ware there under consideration.

All of plaintiff's witnesses testified that the Rockingham earthenware with which they had experience only had a red-clay body, and they were not familiar with either a buff- or other-colored clay body.

The Government witness, W. I. Tycer, in business as W. I. Tycer Pottery Co. of Zanesville, Ohio, testified that he had manufactured teapots and all kinds of kitchen pottery since 1922, had been selling such ware since 1907 throughout the entire United States, was familiar with Rockingham ware, had produced it since 1923 or 1924, and had sold it throughout the United States. He knew that there was such a thing as Rockingham ware by making teapots and glazing them in brown and selling them to the trade. Illustrative exhibit J herein represented a teapot produced by Mr. Tycer as Rockingham earthenware. He described the body of the sample as buff.

Defendant's witness Tycer further testified that there was no difference between the glaze on Rockingham earthenware and other earthenware, but the Rockingham ware glaze must be brown with the main principal color ingredient of manganese. After considerable questioning by Government counsel, in answer to a question whether the manganese glaze was used on other earthenware, the witness answered "Not that I understand." Although the witness had not sold such ware in the United States, he was permitted to give his opinion of the exhibits. He thought that illustrative exhibits A and B would be Rockingham ware; that exhibits 1 and 2 would be a decorated Rockingham ware; and that illustrative exhibit J was Rockingham ware, on account of the brown glaze. He was of the opinion that the distinguishing feature between Rockingham ware and other earthenware was the color and material that the glaze is made from as well as the body. After considerable questioning concerning the uniformity of the brown glaze in Rockingham ware, the witness changed his opinion about exhibits 1 and 2 being Rockingham ware. The general definition of Rockingham ware, according to this witness, was that it has to be a body with a brown glaze but one can put "any decoration on you wish to." The witness was of the opinion that illustrative exhibit D could be Rockingham ware if it were first covered with a manganese glaze, but here again he changed his opinion and excluded it on account of the decoration. In his opinion, the

difference between "B" and "D" was that "B" was entirely covered with a brown glaze while in "D" gold covered the whole thing.

This witness was of the opinion that the common meaning of the term Rockingham ware, as expressed by this court in the *Butler Brothers* case, *supra*, at or prior to June 17, 1930, was the same as the commercial meaning thereof, and he disagreed with the holding of the court in that case that there was a different commercial meaning. His conclusion that the court erred in finding a different commercial meaning was: "Because it does not give lustrous brown glaze to cover the body," and it cannot be a brown glaze unless it is of manganese.

The Government's second witness, Lawrence H. Brown, testified that he was a ceramic engineer employed by the Hall China Co., manufacturer of chinaware and some earthenware, but only in the dinnerware line and not teapots of earthenware. He was not a salesman and had neither bought nor sold Rockingham ware teapots at wholesale in the trade and commerce of the United States. The Government attempted to establish by this witness that there was no difference between the common and commercial meanings of the term Rockingham ware, contending that the scientific meaning as understood by this witness was material in arriving at the common meaning. The witness was allowed to testify that he agreed with the common meaning as announced by the court in the *Butler* case, *supra*, but not with the court's finding of a commercial meaning of Rockingham ware different from the common meaning. The witness stated that his company manufactures only vitrified teapots and "Anybody that sells a cheaper teapot eliminates a sale for us."

Defendant's witness Brown was also allowed to express his opinion, although he had no sales experience, concerning whether or not the exhibits were Rockingham ware. In his view, exhibits 1 and 2 were not Rockingham ware because they have a transparent glaze over the entire assembly with no manganese in the glaze. He considered illustrative exhibits A and B to be Rockingham ware; that illustrative exhibit D was a decorated teapot on a Rockingham base; that "J" is Rockingham ware, and that "E" is also Rockingham ware because it has manganese in the glaze. From his viewpoint, he would consider illustrative exhibit I to be Rockingham ware if it were covered with a brown glaze. Even if the body of the teapot had "a dead white body" made of very fine earthenware, providing it was covered with this manganese glaze, he would consider it to be included in the term "Rockingham ware."

The Government's third witness, M. W. Thompson, the treasurer and general manager of the Hall China Co., testified that he became familiar with Rockingham ware because his company has sold chinaware teapots in competition with Rockingham ware teapots. When asked if he knew what was considered to be Rockinhgam ware in the

trade and commerce of the United States at or prior to June 17, 1930, he answered that he knew, but when he was asked how he knew, his answer was not responsive. When asked if he knew from his own knowledge and experience the method by which Rockingham ware was produced, he stated that he knew, but when asked how he knew, he answered:

A. Well, most of the ceramic trades are quite similar, that is, what I mean is, when you are making Rockingham ware, or if you are making semi-porcelain dinnerware, if you are making vitrified china, the differences are not exceedingly important in the methods of manufacture. Rockingham teapots are fired in the bisque, formed, of course, in the clay and then fired in the bisque. Our earthenware teapots we make, contrary to some of the understanding, we do make a very few earthenware teapots, and then, of course, they are formed and fired in the bisque in the same way.

Our china teapots are formed in the clay, then they are colored and glazed and fired once.

Now, the whole business is very, very similar, and management in the potteries must know about those things.

Clearly, the foregoing is not an answer to the question if and how he knew from his own experience the method by which Rockingham ware was produced. Later on, he stated that he obtained his knowledge mostly from talking with other people and his own knowledge of his company processes. This witness agreed with the common meaning as announced by the court in the *Butler* case, *supra*, and that such meaning coincided with his idea of the commercial meaning.

This witness clearly has shown that he has no understanding of either the common or commercial meaning of the term "Rockingham ware." He was not shown to have had any experience in the trade or commerce, buying or selling either Rockingham ware or a competing ware at wholesale.

Defendant's witness Thompson, although having no sales experience, was allowed further to testify as to his opinion of the exhibits. He stated that exhibits 1 and 2 were not Rockingham ware and would not be a good delivery for Rockingham ware; that illustrative exhibits A, B, and J are Rockingham ware; that illustrative exhibit C is not Rockingham ware; that illustrative exhibit E is a Rockingham body and glaze with an over-glaze decoration; and that illustrative exhibit D has the qualifications for Rockingham, that is, it has a Rockingham body and a Rockingham glaze with an over-glaze gold decoration. Judge Johnson asked the witness this significant question:

JUDGE JOHNSON: Now suppose you put the brown glaze on one of yours, would that change the name of it?

THE WITNESS: It would not be Rockingham.

JUDGE JOHNSON: So the body does have something to do with it, the kind of a body?

THE WITNESS: That is right.

The Government's last witness, Emil Harry Leon, testified that he was the sales manager for Robinson Clay Product Co., which was a distributor for domestic earthenware but has also imported English teapots. The witness had been in the business for 44 years and had bought and sold earthenware up to a few years ago, but mostly in the metropolitan area, but his company has shipped earthenware teapots as far west as Chicago. The witness had also bought and sold Rockingham ware teapots of both domestic and foreign manufacture. In his opinion, the term "Rockingham earthenware" has a definite, general, and uniform meaning in the earthenware industry in the wholesale trade and commerce of the United States and the same meaning prevailed on June 17, 1930. The common meaning of the term as announced in the *Butler* case, *supra*, coincided with his understanding, and exhibits 1 and 2 would not be a good delivery for Rockingham ware because these have a mottled finish under a clear glaze, while Rockingham ware would have a complete coverage of the manganeze glaze. In his opinion, the glaze only gives Rockingham earthenware its name. Under cross-examination, this witness admitted that he had purchased illustrative exhibits B and C as Rockingham ware teapots in the United States; that teapots similar to "C" had the mottled finish; that he would accept and receive delivery of teapots like exhibits 1 and 2, as Rockingham ware; and that he also imported them as Rockingham ware. He stated "We accepted these teapots as banded Rock., C." Illustrative exhibit C was pointed out to the witness and he was asked whether or not it was Rockingham ware. The witness answered "I would say they are not, but they are being sold in the trade as such." He admitted that exhibit 3 was his order for Rockingham ware teapots which were mottled.

To sum up the testimony, plaintiff's witnesses Katz and Miller had bought at wholesale from abroad and sold at wholesale throughout the United States prior to the enactment of the Tariff Act of 1930; witness Minard bought at wholesale only but did not sell at wholesale, such transactions extending back before the enactment of the present tariff act, but he not only bought at wholesale abroad but also in the United States; witness Proctor bought at wholesale only but did not sell at wholesale, his purchases being also made prior to the present tariff act; and witness Tharaud not only bought at wholesale from abroad but sold at wholesale throughout the United States. Such transactions, however, were not made prior to 1945. None of these witnesses had ever had any experience with any Rockingham ware which did not have a red-clay body. They were all agreed that in the trade and commerce of the United States the term "Rockingham earthenware" was generally understood, that is, understood throughout the entire United States; that the meaning of the term "Rockingham earthenware" in the trade and commerce was uniform, that is, it was the same everywhere in the country; that the term "Rockingham

earthenware" had a definite meaning, that is, it was not ambiguous and was certain of understanding throughout the United States; and that the general, definite, and uniform meaning of the term was different from the common meaning thereof. From the experience of these witnesses in the trade and commerce of the United States, they did not agree entirely with this court in the *Butler* case, *supra*, that such commercial meaning would be restricted to include as Rockingham earthenware the so-called samian ware, which was the ware there in question.

Only two of the defendant's witnesses had sold "Rockingham ware" at wholesale in the United States. One had sold the Rockingham ware of his company throughout the United States but had not bought it; the other one also bought Rockingham ware in the United States as well. The first witness sold his own ware which was made of a buff-colored clay body and had thereon a manganese glaze, represented by illustrative exhibit J. The second witness, who bought and sold at wholesale, admitted that although the merchandise at bar was not within the common meaning of Rockingham earthenware, it was bought and sold in the trade as Rockingham ware. This witness' experience was confined locally and did not include sales throughout the entire United States.

Only two of the Government's witnesses testified positively that exhibits 1 and 2 were not Rockingham ware, witness Brown, the ceramic engineer, and witness Thompson, the treasurer and general manager of the Hall China Co., neither of whom bought or sold in the trade and commerce of the United States and had reference only to the common meaning thereof. Witness Tycer first testified that exhibits 1 and 2 were Rockingham ware and later changed his opinion. Witness Leon testified that exhibits 1 and 2 did not come within the common meaning of Rockingham ware, but in the trade and commerce of the United States they were sold as Rockingham ware, as claimed by the plaintiff herein. Therefore, as for the merchandise under consideration herein, the only two witnesses testifying positively that exhibits 1 and 2 were not Rockingham ware were not qualified as commercial witnesses. Witness Brown testified that illustrative exhibit I, described above as having a very fine dead white earthenware body, would, in his opinion, be Rockingham ware if it were covered with a manganese glaze. The Government witnesses were not only in disagreement as to whether or not the earthenware body had anything to do with an article being Rockingham ware, but they were not agreed relative to which of the illustrative exhibits represented Rockingham ware.

Counsel for the plaintiff contends that the merchandise in question in this case is Rockingham ware, although excluded from the judicial definition of the common meaning of the term "Rockingham earthenware," as announced in the case of *Butler Brothers*, *supra*, for the same

reason that the merchandise in that case was excluded, that is to say, it was excluded because it comes within the commercial meaning of the term "Rockingham earthenware," as that term was used in the trade and commerce of the United States at or prior to time of the passage of the Tariff Act of 1930.

Counsel for the plaintiff further contends that it has been conclusively established by the evidence that teapots like exhibits 1 and 2 and illustrative exhibits A to H were known, bought, and sold in the wholesale trade and commerce of the United States at and prior to June 17, 1930, under the designation Rockingham earthenware or Rockingham ware.

Counsel for the Government contends that the teapots in question do not fall within the common, commercial, or legislative meaning of the term "Rockingham earthernware."

By permission of the court, Lamb & Lerch, Esqrs., presumably representing the American manufacturers of earthenware and chinaware, were allowed to file a brief as *amici curiae*.

They stressed the fact that there was an agreement between counsel that the imported teapots herein had the same body as Rockingham earthenware but did not have the so-called Rockingham glaze brought about by the use of manganese stain, but rather a mottled effect was produced by applying a sponge dipped in manganese over a clear or transparent glaze. Also, they called attention to the fact that all of plaintiff's witnesses in effect testified that they would consider any teapot made of red clay as Rockingham ware; that it was bought and sold in the trade as such; and that the color of the glaze had nothing whatever to do with the trade meaning of Rockingham ware. And *amici curiae* contend therefrom that such testimony is directly opposed to the understanding of the term "Rockingham earthenware" intended by Congress and defined by the courts as a ware dependent upon the type of body, the type of glaze, and the manganese stain, excepting, of course, the case of *Butler Brothers, supra*, which was not appealed by the Government.

It is further argued that every time Congress enacted a new tariff act, it had before it the court's decisions and legislated accordingly; and that it had before it the results of investigations made by the Tariff Commission describing Rockingham ware as having a manganese glaze, in addition to being made of red clay. They cite in support of such a view the case of *Cadwalader* v. *Zeh*, 151 U. S. 171, wherein the court stated that the commercial meaning is to prevail, "unless Congress has clearly manifested a contrary intention." Further, that in respect to the classification of Rockingham ware, by virtue of the judicial and legislative history thereof, Congress, in writing paragraph 210 of the Tariff Act of 1930, clearly manifested an intention that only such articles as fall under the common meaning of the term should be so classified.

*Amici curiae* further contend that the plaintiff in this case has failed to prove a commercial meaning of the term "Rockingham ware" different from the common meaning. Counsel in that regard rely upon a concurring opinion filed in the *Butler Brothers* case, *supra*, which it is stated would have been a dissent had not the Government conceded that the evidence established a commercial designation for the teapots there in question, and where the concurring judge stated he was not convinced that the evidence established a commercial designation for Rockingham ware.

Whatever the reasons for the concurrence of the minority of the court, it might be well to point out here that the *Butler Brothers* case, *supra*, was tried in several ports throughout the United States. There were 10 well-qualified witnesses testifying for the plaintiff and 4 for the Government, and 12 of these witnesses, who, collectively, had sold Rockingham ware in all parts of the United States, were uniform in their testimony that a Rockingham ware teapot in the trade and commerce of the United States had a body composed of a red clay, and that it had a high-luster finish and would include so-called samian ware. The court in the *Butler Brothers* case, *supra*, although confining its decision to such of the teapots as were there in question, stated that there was in the wholesale trade and commerce of the United States a meaning for Rockingham ware which was different from the common meaning thereof and that such meaning was definite, uniform, and general, and comprehended either a yellow- or red-clay body having a lustrous glaze and was not confined to a glaze having manganese as the chief coloring ingredient.

It has been held that the popular import of words furnishes the general rule for the interpretation of statutes, and when Congress adopts such language to define the article upon which duty is to be levied, the conclusion to be reached is that it has reference to the known usage of those for whom it is designed to constitute a rule. See *Maillard* v. *Lawrence*, 16 How. 251; *Arthur* v. *Morrison*, 96 U. S. 108. In tariff cases, the law has long recognized the authority of those engaged in commerce, and adopts necessarily and as conclusive the meaning which they have given to words and phrases employed in their daily business. See *Recknagel* v. *Murphy*, 102 U. S. 197. Merchandise is classified according to the general usage and known denominations of trade, and the language adopted by Congress should be construed according to the commercial understanding of the terms used. *Elliott* v. *Swartwout*, 10 Pet. 137. That is to say, the denomination of merchandise subject to the payment of duties is to be understood in a commercial sense, although it may not be scientifically correct, as all laws regulating the payment of duties are for practical application to commercial operations to be understood in such commercial sense. See *United States* v. *112 Casks of Sugar*, 8 Pet. 277.

Therefore, the descriptive terms applied to "Rockingham earthenware" are to be understood according to the acceptance given them by commercial men in our own ports at the time of the passage of the tariff act in which such words are found. See *Arthur* v. *Cumming*, 91 U. S. 362; *Tyng* v. *Grinnell*, 92 U. S. 467; *Arthur* v. *Butterfield*, 125 U. S. 70.

The Supreme Court in the case of *Two Hundred Chests of Tea*: *Smith, Claimant*, 9 Wheat. 428, 6 L. ed. 128, had under consideration an importation of tea imported and entered as bohea tea. The Government contended that it was not bohea tea, as the tariff act referred to a pure and unmixed bohea tea, and not to any other mixed tea even though known as bohea tea. In holding the tea properly dutiable under the trade designation of bohea tea, Mr. Justice Story, speaking for the Court, stated:

* * * If we were to advert to scientific classifications for our guide on the present occasion, it is most manifest, from the works cited at the bar, that bohea is a generic term, including under it all the black teas, and not merely a term indicating a specific kind. But it appears to us unnecessary to enter upon this inquiry, because, in our opinion, Congress must be understood to use the word in its known commercial sense. The object of the duty laws is to raise revenue, and for this purpose to class substances according to the general usage and known denominations of trade. Whether a particular article were designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance, was of no importance in the view of the legislature. It did not suppose our merchants to be naturalists, or geologists, or botanists. It applied its attention to the description of articles as they derive their appellations in our own markets, in our domestic as well as our foreign traffic. And it would have been as dangerous as useless, to attempt any other classification than that derived from the actual business of human life. Bohea tea, then, in the sense of all our revenue laws, means that article which, in the known usage of trade, has acquired that distinctive appellation. * * * it must be presumed that Congress, in this last act, referred itself to the existing standard, and not to any scientific or antequated standard.

The true inquiry, therefore, is, whether, in a commercial sense, the tea in question is known, and bought, and sold, and used, under the denomination of bohea tea. We think the evidence on this point is altogether irresistible. It establishes that the bohea tea of commerce is not usually a distinct and simple substance, but is a compound made up in China of various kinds of the lowest priced black teas, and the mixture is of higher or lower quality, according to the existing state of the market. * * * It is accordingly in proof, that old congo teas are often sold as bohea, and have sometimes been imported into our market under that denomination. In short, whenever black teas are deteriorated by age, or are of the lowest price, they are mixed up to form bohea for the market, and are suited to the demand and wishes of the purchasers. It is not meant to affirm that there is no such simple and distinct tea known as bohea. All that the evidence justifies us in saying is, that this is not the common bohea of commerce. The latter may or may not be a simple substance, according to circumstances. The generic name, bohea, comprehending under it all the varieties of black teas, whenever they are at the cheapest price in the market, or are of a very inferior quality, or are mixed up for sale, they lose their specific names, and sink into the common denomination.

Such is the conclusion which, in the opinion of the court, the evidence in this record justifies and requires. It is true, that the Boston witnesses very strongly state that the present teas are pure unmixed congo; and their testimony is entitled to very great consideration, from their personal respectability as well as their long experience. But the New York witnesses speak with equal positiveness and point, that the present teas are the common bohea of the market, and have been bought and sold as such without hesitation. These witnesses, also, are entitled to entire credit, for the same reasons; they have had great experience, and are of unquestioned credibility. In this apparent conflict of competent and credible witnesses, the only way of reconciling the testimony, is to suppose that they do not speak ad idem; that the Boston witnesses speak to the specific nature of the particular teas in controversy, and the New York witnesses to their known commercial denomination in their actual state. In this way of considering the testimony, the conflict exhibits more a matter of apparent than real diversity of opinion. But if it be not thus reconcilable, it appears to us that the weight of the evidence is so strong that teas of this description have been long imported into our market as bohea, that no court of justice would feel itself authorized to inflict the forfeiture under the statute, upon a presumed intentional violation of its provisions.   *   *   *

In the situation presented in the pending case, we have the tariff term, "Rockingham earthenware." It is in no way refuted by any of the witnesses testifying in this case that the cheap red or buff earthenware with a glaze of high intensity is not Rockingham earthenware, as variously defined, but it is contended with sincerity and justification as would appear from the evidence produced by these reputable businessmen that in trade and commerce throughout the United States certain cheap red-clay ware having glazes the color of which is produced by substances other than manganese is definitely known as "Rockingham earthenware," and such knowledge in the trade is general and uniform throughout the country, and not partial, local, or personal.

In the contention urged by *amici curiae* that, because of the many definitions of the common meaning of the term "Rockingham earthenware" over the years, presumably before the Congress at the time the provision was written in the tariff act, only the common meaning of the term was intended because Congress had not clearly manifested a contrary intention, counsel have failed to recognize that Congress adopts necessarily, and as conclusive, the meaning which the trade employs in its daily business, as stated by the Supreme Court, in decisions cited above. The Supreme Court case of *Cadwalader* v. *Zeh*, *supra*, relied upon by counsel as support of such theory, involved, among other articles, small earthenware cups and saucers having upon them letters of the alphabet and figures of animals. They were classified as decorated earthenware and claimed dutiable as toys. The Court stated that the tariff act contained nothing from which it can be inferred that the word "toys" is used therein in any other than its commercial meaning in order to enable it to embrace cups and saucers, etc. The Court noted that the jury had been instructed that its verdict should be for the defendant if it found there was no trade desig-

nation of the articles as toys and that the articles were not chiefly used as playthings for children.

The foregoing case supports the general rule that if words are used to designate a particular kind or class of goods which have a well-known signification in the trade and commerce of the country "different from their ordinary meaning among the people, the commercial meaning is to prevail." It does not support counsel's novel theory that a repetition over the years of the common meaning of a term by the Tariff Commission and the courts would carry with the *eo nomine* provision therefor in the tariff act a congressional intention only to provide for duty upon goods coming within that nomenclature, irrespective of the trade designation, unless a contrary intention was clearly manifested.

Counsel might have had in mind a situation like that in the case of *Newman* v. *Arthur*, 109 U. S. 132, 27 L. ed. 883, where certain cotton goods known as Italians were assessed according to the thread count. It was there contended that the goods should not have been so assessed for the reason that with reference to such goods the threads were not counted in ordinary transactions. The Court held that reference to commercial use of the article failed because the language used was unequivocal. The law fixed the rate of duty by a classification based on the number of threads per square inch, without reference to the mode in which the count was to be made, and if Congress had intended to exclude cotton goods which were not in commercial usage dealt in by the thread count, it could easily have so provided. It is clear that classification of Rockingham earthenware teapots was provided for without restriction, and therefore it must be presumed that Congress used the term in its commercial sense. Had it not so intended, it would have defined the ware to which the term should be applied.

It is the opinion of the court that the Congress in providing *eo nomine* for Rockingham ware could not have intended to so stabilize the tariff meaning of the term, or manifest a contrary intention, that evidence of commercial designation would be unacceptable. However, as amply established in the *Butler Brothers* case, *supra*, decided more than 12 years ago, and in this case, the term "Rockingham ware" prior to June 17, 1930, in the wholesale trade and commerce of the United States, had a meaning different from the common meaning, as such was judicially defined and determined, and that the definite, uniform, and general meaning of the term was not confined to a glaze having manganese as the chief coloring ingredient. In fact, although it includes such ware with glazes of the same character, it does include as well glazes of various colors, the majority of which, however, range from brown to black but would comprehend the stippled or mottled ware here in question.

The weight of the evidence in this case, as in the *Butler Brothers* case, *supra*, supports the contention of plaintiff that there is a commercial

meaning for the term "Rockingham earthenware" which is different from the common meaning thereof. Not only has it been established by a preponderance of evidence that the commercial meaning thereof includes such class of cheap earthenware as is within the common meaning of the term but, in addition, that it also includes an earthenware body composed of an inexpensive red clay having a lustrous glaze which is variously colored. Therefore, in conformity with the decisions cited herein, including particularly *Two Hundred Chests of Tea, supra,* and *Butler Brothers, supra,* it is held that there would be included within the designation "Rockingham earthenware" red-clay teapots having a lustrous glaze, colored so as to have a stippled or mottled appearance, and decorated with slips of different clays, as represented by exhibits 1 and 2.

Judgment will therefore be entered in favor of the plaintiff directing the collector to reliquidate the entry and assess duty thereon at the rate of 12½ per centum ad valorem under paragraph 210, as modified by T. D. 49753, as claimed, and to refund all duties taken in excess.