(C.D. 2177)

JUSTIN THARAUD & SON, INC.
J. J. MURPHEY & Co. } *v.* UNITED STATES

United States Customs Court, Third Division

(Decided May 11, 1960)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiffs.
*George Cochran Doub*, Assistant Attorney General (*Richard E. FitzGibbon*, trial attorney), for the defendant.
*Lamb & Lerch* (*David A. Golden* of counsel) as *amici curiae*.

Before JOHNSON, DONLON, and RICHARDSON, Judges

JOHNSON, Judge: This is a protest against the collector's assessment of duty on certain earthenware articles at 5 cents or 10 cents per dozen pieces and 25 per centum ad valorem under paragraph 211 of the Tariff Act of 1930, as modified, as decorated earthenware, wholly or not wholly of clay, respectively. At the trial, the case was limited to items listed on page 12 of the invoice designated by numbers running consecutively from No. 1556 to No. 1563, inclusive. Said merchandise consists of earthenware teapots and is claimed properly dutiable at 20 cents per dozen articles, but not less than 7½ per centum nor more than 25 per centum ad valorem, under paragraph 210 of the Tariff Act of 1930, as modified, as Rockingham earthenware.

The pertinent provisions of the tariff act, as modified, are as follows:

Paragraph 211 (as modified by the Trade Agreement with Mexico, T.D. 50797):

Earthenware and crockeryware composed of a nonvitrified absorbent body, * * * and all other articles composed wholly or in chief value of such ware; any

of the foregoing which is earthenware having a body not artificially colored and composed wholly of clay, * * * :

\*      \*      \*      \*      \*      \*      \*

> Painted, colored, tinted, stained, enameled, gilded, printed, ornamented, or decorated in any manner, and manufactures in chief value of such ware, not specially provided for_____ 5¢ per doz. pieces, and 25% ad valorem.

Paragraph 210 (as modified by the General Agreement on Tariffs and Trade, T.D. 51802):

Rockingham earthenware_____ 20¢ per doz. articles, but not less than 7½% nor more than 25% ad valorem.

At the trial, counsel for the plaintiff stated:

> We do not contend in this case that the imported teapots come within the common meaning of the term "Rockingham earthenware" as used in paragraph 210. It is our contention, however, that this merchandise is included within the commercial meaning of the term "Rockingham earthenware" and that the commercial meaning is different from the common meaning.

In *Butler Brothers* v. *United States*, 4 Cust. Ct. 120, 121, C.D. 303, the court stated that:

> * * * the common meaning of the term "Rockingham earthenware" applies to a certain class of cheap earthenware generally composed of a reddish clay body, but sometimes of a yellow, and less frequently of a white clay body. The body is covered with a brown glaze, the chief coloring ingredient of which is manganese. That, because of the composition of the glaze, Rockingham earthenware must of necessity be of practically the same color, an opaque rich brown, although there might be some variation in the shade, depending upon the proportions of the ingredients and the conditions under which the Rockingham ware is fired.

It was held, in that case, that on and prior to June 17, 1930, in the wholesale trade and commerce of the United States, the term "Rockingham earthenware" had a different commercial meaning which comprehended earthenware having a yellow or red clay body with a lustrous glaze, usually ranging from brown to black, and was not confined to a glaze having manganese as the chief coloring ingredient.

In a subsequent case, *M. & D. Miller, Inc.* v. *United States*, 28 Cust. Ct. 195, C.D. 1410, this court again held that there was a commercial meaning for the term "Rockingham earthenware" different from the common meaning and that it comprehended "an earthenware body composed of an inexpensive red clay having a lustrous glaze which is variously colored." The court of appeals affirmed. *United States* v. *M. & D. Miller, Inc.*, 41 C.C.P.A. (Customs) 226, C.A.D. 556.

The merchandise before the court in the *Miller* case (exhibits 1 and 2) consisted of teapots having a red clay body, coffee brown in color, with slightly darker spots, having a mottled effect, and having lighter

bands, also mottled. It was stipulated that after the first firing the teapots had been dipped in a transparent glaze after which a Rockingham glaze (manganese stain) had been applied by sponge to produce the mottled effect. In addition to the imported teapots involved in the case, several other teapots were introduced into evidence as illustrative exhibits and testimony was adduced as to them. The record in that case was incorporated into the record in the instant case without objection.

At the trial in the instant case, Justin Tharaud, president of Justin Tharaud & Son, Inc., testified that he was familiar with the merchandise involved herein and that it was represented on the photographs received in evidence as plaintiffs' collective illustrative exhibit 4. There was also received in evidence a teapot, No. 1556, in pink, representative of the merchandise described on the invoice (plaintiffs' exhibit 5).

The witness' attention was then directed to exhibit F in the incorporated case, which he stated was the same as item No. 1557, in green, in the instant case, and that it was composed of a red earthenware body with a lustrous glaze. The witness stated, further, that items 1556 through 1563 were all red-bodied and had a lustrous glaze, differing from exhibit F only as to decoration.

Exhibit F in the incorporated case consists of a teapot having a brown glazed interior and a decorated exterior. The handle, spout, and the bottom quarter of the body are covered with gold, and the top three-quarters of the body is light green with a gold so-called "Vermicelli" decoration.

In the incorporated case, Morris Katz, vice president of Marks & Rosenfeld, Inc., importer of English merchandise, testified that he had bought Rockingham ware for 15 years and had sold it for 30; that he had sold such ware all over the United States, in all of the (then) 48 states, had gone on the road himself, and had sold to buyers who came to his place of business in New York. He sold merchandise like exhibits 1 and 2 in every principal city of the country, at wholesale, as Rockingham teapots. He also stated that he was familiar with exhibit F and had bought similar articles at and prior to June 17, 1930, and had sold them as Rockingham ware. He described the exhibit as an "English Rockingham teapot, elaborately decorated, gold stamp work, full gold bottom, full gold handle, full gold spout." In his opinion, based upon his experience in buying and selling at wholesale in the United States on and prior to June 17, 1930, the term "Rockingham ware" was employed in the trade to mean teapots imported from England, having a red body. The color of the body was the distinguishing characteristic, not the ingredients of the glaze or the color or the decoration. The trade understanding

of the term was general, definite, and uniform in the United States on and prior to June 17, 1930.

Elmer E. Proctor, who at the time of the trial of the incorporated case was managing director of Metasco, Inc., but who had been a buyer for Jordan Marsh Co. of Boston from 1930 to 1945 and prior to that a buyer for James McCreery & Co. of New York, testified that he had purchased Rockingham ware at wholesale in the United States for McCreery's; that his purchases had included merchandise similar to exhibits 1 and 2 and A through H. He had also purchased teapots abroad for Jordan Marsh and for Metasco. He described the exhibits and stated he would prefix the description with the word "Rockingham" in all instances. He defined Rockingham ware, as understood in the trade of the United States on and prior and since June 17, 1930, as teapots made of a red body, usually inexpensive, and with a variety of glazes. It made no difference whether the merchandise was mottled or colored in various colors. Said understanding was, according to the witness, general, definite, and uniform in the trade.

George E. Minard, who had been a buyer for Stern Brothers, New York City, from 1916 until 1949, testified that he had imported Rockingham ware from England and had bought it wholesale in the United States and that he had purchased merchandise like exhibits 1 and 2 and A through F as Rockingham ware. In his experience, Rockingham ware had a red basic body with decorations of different glazes or with mottlings or mottled bands and that understanding was general, definite, and uniform in the trade.

Donald M. Miller, vice president of M. & D. Miller, Inc., the plaintiff in the incorporated case, testified that he had begun to handle Rockingham teapots in 1916 and had sold them at wholesale in the United States on and prior to June 17, 1930, traveling himself east of the Mississippi and selling to purchasers from other parts of the country at the home office or through the company's salesmen. His firm sold very large quantities of teapots at wholesale in the United States on and prior to June 17, 1930. For instance, he mentioned taking an order for 3,000 dozen of one type, size, and decoration, with other teapots on that order. He had sold merchandise like the exhibits in the case in the wholesale trade of the United States as Rockingham ware. In his experience, the term "Rockingham ware" was understood in the trade and commerce of the United States to mean articles having a red clay body, not those having a certain kind of glaze. They could have a clear glaze or a stained glaze. According to the witness, manganese glaze could be put on an earthenware body but that would not make the product Rockingham ware. The witness stated, further, that, regardless of the type of decoration, if the

article had a red body, it was known to the trade as Rockingham ware. He would not consider a teapot made of refined white pottery clay, having decorations similar to those of exhibit F, as a Rockingham teapot.

Mr. Tharaud testified both in this case and in the incorporated case that he had not purchased or sold Rockingham ware teapots prior to 1945.

The four witnesses who testified on behalf of the Government in the incorporated case stated in substance that there was no trade distinction between the commercial and the common meanings of the term "Rockingham earthenware." Two of these witnesses had had no commercial experience but testified, nevertheless, that Rockingham ware must have a lustrous brown glaze. Of the other witnesses, W. I. Tycer, a domestic manufacturer of pottery, stated that Rockingham ware must consist of a body covered with a brown glaze. He at first identified exhibits 1 and 2 as being commercially comprehended in the trade as Rockingham earthenware, but later changed his opinion. At one point, he said exhibit D (a brown teapot whose upper portion is covered with gold) could be Rockingham ware, but later stated it was not. The last witness, Emil Harry Leon, testified that he sold earthenware articles primarily in the New York metropolitan area and that glaze was the distinguishing feature of Rockingham ware. In his opinion, exhibit C (a brown mottled teapot with lighter mottled bands) was not Rockingham ware, but it was being sold in the trade as such.

Defendant called five additional witnesses in the instant case.

Dr. Arthur S. Watts, a professor and consultant in ceramic engineering, described the method of production of Rockingham ware, stating that it consisted of a red-burning or a buff-burning clay with a lead glaze colored by the addition of manganese or a manganese salt which produced a luster on the surface of the ware.

Josiah D. Thompson, at present sales manager of the Homer Laughlin China Co., testified that he had sold Rockingham ware for the C. C. Thompson Pottery Co. between 1913 and 1918, but had not sold it since that time. His testimony as to the 1913 to 1918 period was stricken as having no bearing on the commercial designation of the term "Rockingham ware" in 1930.

John Kennedy, who has been manager of the Boston office of the Robinson Clay Products Co. since 1937 and was resident manager of the Albany office from 1934 to 1937 and prior to that salesman and clerk in that office, testified that his firm had purchased Rockingham ware in the United States from 1922 to 1932 and had imported it since 1937; that it was part of his duties to know the type of merchandise that his company was selling; and that his firm sold Rockingham ware in New York and New England. He stated that Rockingham

ware was generally made on a "lead" body, occasionally on a buff body; that the glaze was black or a deep brown with a high luster. To his knowledge, his company had not sold merchandise similar to exhibit F or the items depicted on plaintiffs' collective exhibit 4 as Rockingham ware. His firm did sell teapots decorated like those in said exhibits but having a white earthenware body, not a red body.

George Cooke, who had been employed by Jones, McDuffie & Stratton between 1926 and 1929, by John Wanamaker from 1929 to 1932, and subsequently again by Jones, McDuffie & Stratton, testified that he had purchased Rockingham ware in England prior to 1929 and had seen merchandise like exhibit F, but had not imported any until 1932. The merchandise he purchased as Rockingham ware was like exhibit J (a teapot with a buff-colored body, having a brown glaze). While he was with Jones, McDuffie & Stratton, he had sold merchandise at exhibits in Pittsburgh, New York, and Boston. He also testified that, at and immediately prior to June 17, 1930, he had sold decorated earthenware teapots like exhibit F, having a red clay body with a clear glaze, but never as Rockingham ware. While he was with John Wanamaker, he had purchased merchandise like exhibit J as plain Rockingham ware.

A. E. Hull, a ceramic engineer, testified that from 1917 to 1930 he was with the A. E. Hull Pottery Co.; that the firm purchased Rockingham ware like exhibit J from England between 1923 and 1930 and sold it in New York and Philadelphia to chainstores throughout the United States as Rockingham teapots. He also purchased merchandise which looked like exhibit F between 1923 and 1930 as earthenware and sold it under a line name. However, the merchandise he bought and sold had a white earthenware body, not a red one.

Plaintiffs claim that the merchandise involved herein is similar in all respects to exhibit F in the incorporated case and that the commercial meaning for the term "Rockingham earthenware" established in that case embraced exhibit F as well as the imported merchandise represented by exhibits 1 and 2 and, therefore, includes the merchandise in the instant case.

Defendant claims that although mottled brown earthenware was held to come within the commercial meaning of the term "Rockingham earthenware," not all decorated earthenware comes within that term.

*Amici curiae* contend, as they did in the incorporated case, that the legislative history indicates that Congress intended to include within the term "Rockingham earthenware" only those articles which conformed to the common meaning of that term and, further, that the plaintiffs herein have failed to prove a commercial meaning different from the common meaning.

It is well settled that tariff statutes are written in the terms of commerce and that "if words used therein to designate particular kinds or

classes of goods have a well known signification in our trade and commerce, different from their ordinary meaning among the people, the commercial meaning is to prevail, unless Congress has clearly manifested a contrary intention." *Cadwalader* v. *Zeh*, 151 U.S. 171, 176; *United States* v. *J. L. Galef*, 18 C.C.P.A. (Customs) 180, T.D. 44377; *Neuman & Schwiers Co., Inc.* v. *United States*, 24 C.C.P.A. (Customs) 127, T.D. 48606.

The argument of *amici curiae* that Congress intended the tariff provisions for Rockingham earthenware to be limited to its common meaning was answered by our court of appeals in *United States* v. *M. & D. Miller, Inc., supra*, as follows (p. 232) :

Congress in enacting and re-enacting the Rockingham earthenware provision of the various tariff acts, including the Tariff Act of 1930 with its subsequent modifications, did so at a time when the term in question had previously been interpreted by the courts and further defined by the United States Tariff Commission in its reports to Congress and the President. However salient such a fact may seemingly be, it does not, in itself, present sufficient justification upon which to conclusively presume that Congress intended to restrict the classification of Rockingham earthenware to its common (and presumptively commercal [*sic*]) meaning. Despite the knowledge it possessed at the time of enacting the Act of 1930, Congress provided without qualification for Rockingham earthenware, and there is no clear manifestation of an intention to adopt the established common meaning to the exclusion of proof indicative of a true commercial designation different therefrom. See *Cadwalader v. Zeh*, 151 U.S. 171. In *Wanamaker v. United States*, 13 Ct. Cust. Appls. 93, T.D. 40939, this court stated :

The rule that, by the reenactment in the same language of a prior statute, a former judicial interpretation thereof is thereby approved, can apply so far only as the common meaning is concerned. It can not apply to commercial meaning, because that must always be established, like any other fact, by competent evidence introduced in the case in which such meaning is in issue. [Citing cases.]

The question before us, therefore, is whether a commercial meaning for the term "Rockingham earthenware" has been established by a preponderance of evidence and whether the merchandise before us is comprehended by said meaning.

As has been stated, it was held in the incorporated case that there was a commercial meaning for the term "Rockingham earthenware" different from its common meaning and that it included red-clay teapots having a lustrous glaze, represented by exhibits 1 and 2. *United States* v. *M. & D. Miller, Inc., supra*. The witnesses in that case also testified that merchandise exemplified by exhibit F was bought and sold commercially as Rockingham ware and that the term "Rockingham ware" in the trade and commerce of the United States meant teapots having a red clay body and that such teapots might have a variety of glazes, colors, and decorations.

Of the additional witnesses who testified for the defendant at the trial in the instant case, three had had experience in buying and selling

earthenware at wholesale in the United States on and prior to June 17, 1930. Mr. Kennedy's experience was limited to New York and New England and did not include the purchase and sale of merchandise having a red clay body similar to that involved herein, but only the sale of similarly decorated white earthenware. Likewise, Mr. Hull had purchased only white earthenware decorated like exhibit F, but not any so decorated with a red body. While Mr. Cooke testified that he had sold merchandise like exhibit F having a red clay body with a transparent glaze, but never as Rockingham ware, it is apparent that this could not have been prior to 1930, since he testified that he had not imported such merchandise for Jones, McDuffie & Stratton prior to 1932 and that, from 1929 to 1932, when he was with John Wanamaker, he purchased merchandise like exhibit J. His testimony that, in his experience, merchandise like exhibit F was not bought or sold as Rockingham ware on and prior to June 17, 1930, is entitled to little weight.

On the record presented, we find that it has been established that, on and prior to June 17, 1930, there was a commercial meaning for the term "Rockingham earthenware" different from the common meaning; that said meaning was general, uniform, and definite in the trade and commerce of the United States; that, at that time, within the trade and commerce of the United States, the term "Rockingham earthenware" was used to designate articles composed of a red clay body, having a variety of glazes, colors, and decorations; and that the merchandise involved herein, designated on page 12 of the invoice as items No. 1556 to 1563, inclusive, was comprehended within that term.

We hold, therefore, that said merchandise is properly dutiable at 20 cents per dozen articles, but not less than 7½ per centum nor more than 25 per centum ad valorem, under paragraph 210 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, as Rockingham earthenware.

To that extent, the protest is sustained. As to all other merchandise and in all other respects, the protest is overruled. Judgment will be rendered accordingly.