(C. D. 1056)

Southwestern Sugar & Molasses Co. *v.* United States

United States Customs Court, Third Division

(Decided June 11, 1947)

*Sharretts & Hillis* (*Edward P. Sharretts* and *Joseph Schwartz* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Harold L. Grossman,* special attorney), for the defendant.

Before CLINE and EKWALL, Judges

CLINE, Judge: These are protests against the collector's assessment of duty on certain merchandise, known as "Pasto Miel," at the rate of three-tenths of 1 cent per pound under paragraph 730 of the Tariff Act of 1930 as a feed mixture in chief value of oil cake and oil-cake meal. The collector's classification is apparently based upon the appraiser's advisory classification of the merchandise as a nonenumerated manufactured article dutiable by virtue of paragraph 1559 at the highest rate that would be chargeable if composed wholly of the component material of chief value, in this case oil cake or oil-cake meal. The importer claims that the merchandise is properly dutiable as a mixed feed at 5 per centum ad valorem under paragraph 730, as modified by the trade agreement with Canada (T. D. 49752) and the trade agreement with Mexico (T. D. 50797). The protests also claim that the merchandise is free of duty under Public Law 211 (57 Stat. 607) and Public Law 272 (58 Stat. 131) or at 10 per centum under paragraph 1558. However, these claims were not pressed at the trial and will not be considered herein.

The merchandise was imported from Mexico on December 17 and 24, 1943. It is described on the invoices as "mixed cattle feed" and as "mixed feed consisting of sesame meal, oats, barley and molasses." According to the testimony of Francisco Orepeso, production manager of the manufacturing concern, the merchandise consists of 50 per centum oil cake, 10 per centum turnips, 20 per centum molasses, and 20 per centum bran. The reports of the United States customs laboratory at New Orleans describe the merchandise as follows:

Chemical analysis shows that this sample to be a mixed feed, being a mixture of sesame seed oil cake, bran and molasses and added mineral matter. (Protest 116493–K.)

Chemical analysis and screening tests show this sample is a mixed feed, consisting of sesame meal, ground grain products and molasses. (Protest 116494–K.)

The pertinent portion of paragraph 730 of the Tariff Act of 1930 is as follows:

PAR. 730. * * * all other vegetable oil cake and oil-cake meal, not specially provided for, three-tenths of 1 cent per pound; mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs, 10 per centum ad valorem.

The trade agreements between the United States and Canada (T. D. 49752) and between the United States and Mexico (T. D. 50797) reduced the rate on mixed feeds to 5 per centum.

The merchandise herein consists of a mixture of grain or grain products (bran), oil cake or oil-cake meal, molasses, and other feedstuffs (turnips). The Government claims, however, that it is not a "mixed feed" because it is not a balanced or a complete ration for cattle.

According to the testimony of Dennis C. Turner, purchasing agent of Houston Milling Co., Inc., the shipment in the instant case was not used as imported, but, on account of the shortage of proteins at the time, milomaize, kaffir, and oats were added to the mixture to reduce the percentage of protein from 24 or 25 per centum to 18 per centum. However, that was done because the Government had asked that proteins be conserved, and not because the witness believed the higher percentage of protein would be harmful to the animal.

As to whether or not Pasto Miel is a complete ration, Abram I. Kaplan, president of the importing firm, testified that it is a concentrate and that roughage (hay, ensilage, distillery byproducts, etc.) is fed with it; that Pasto Miel is a well-rationed food but that a farmer would use more or less of it depending upon the feeding value of his roughage; that he had seen Pasto Miel fed to cattle in its condition as imported; that there is "no such thing" as feeding cattle 36 per centum protein feed without roughage; that it is complete as a concentrated feed to be used along with roughage.

Russell B. W. Ludwick, Deputy-in-Charge, Feed and Fertilizer Control Office of New Mexico, testified that it is customary to supply roughage along with mixed feeds because roughages are necessary for animals; that he had fed cattle a 30 per centum protein mixed feed together with roughage; that Pasto Miel is not a complete feed without roughage.

Ivan Watson, livestock specialist for the New Mexico Extension Service of A. & M. College; S. N. Chauvet, buyer and feeder of livestock for the Patton Packing Co.; and Joe M. Evans, a buyer and seller of cattle, all testified in substance that a mixture such as Pasto Miel is not a complete ration because it lacks bulk, but that it is an adequate feed with the addition of roughage.

Robert B. Price, a dairyman, testified that he had used Pasto Miel in combination with other feeds; that since the roughage he used was

alfalfa hay which is high in protein content, the protein percentage of Pasto Miel was reduced by the use of other concentrated feeds low in proteins, but that it could be used with a low protein roughage.

E. D. Beck, County Agricultural Agent of Webb County, Tex., stated that a mixture such as Pasto Miel would not constitute a balanced ration without the addition of roughage; that roughages are used with all mixed feeds; that an animal could not survive eating a concentrated feed alone; that digestive disturbances and blindness would result.

Fred D. Brock, Chief of Feed Control Service of Texas, testified that a mixture such as Pasto Miel is not a complete feed for cattle because of the lack of fiber bulk which is necessary to a cow; that it could be balanced by the addition of a roughage which carried enough carbohydrates and not too much ligneous matter.

However, Dr. P. B. Pearson, nutritionist and biochemist for the Texas Agricultural Experiment Station of A. & M. College, stated that a mixture such as Pasto Miel would be unsatisfactory as a ration for cattle because it is low in fiber or bulk, has an excess of protein, and is low in vitamin content.

It is clear from all of this testimony that Pasto Miel is not a complete ration but must be supplemented by roughage.

We turn now to the question of whether the percentage of protein in the mixture is considered too high. Mr. Kaplan testified that the protein content of the imported merchandise ran about 30 per centum, which was higher than the average at the time in this country because of a protein shortage here. However, this percentage was found by calculation, not chemical analysis. The chemical analysis made at the United States customs laboratory at New Orleans on November 7, 1944, reports the percentage of protein as 31.7 per centum in protest 116493–K and 30.4 per centum in protest 116494–K, but Mr. George E. Beavers, acting chief chemist, testified at the trial that an error had been made and that the correct percentage was 26.03.

Mr. Kaplan stated that an animal will assimilate a 43 per centum protein feed; that a 36 per centum protein feed would have a beneficial effect on the animal; that it would not cause scours, diarrhea, or garget bags. Mr. Turner stated that until the protein shortage his firm was manufacturing and selling feeds containing 24 and 36 per centum protein; that they had received no complaints, and that he did not believe 32 per centum protein would be harmful to livestock. Mr. Ludwick testified that he had fed dairy cattle a feed containing 30 per centum protein through an entire winter and had observed no bad reactions; that 43 per centum protein feeds have been registered in New Mexico and are regarded as noninjurious. Mr. Watson testified that cotton seed cakes containing 43 per centum protein are fed

to range cattle and that no injury results if the amount fed is started low and gradually increased; that when range grasses have lost a high per centum of their protein through bleaching and weathering, a 30 per centum protein feed would not be considered too high. Mr. Chauvet also stated that a mixture containing 30 per centum protein would not be injurious and that he had fed cotton seed containing as high as 43 per centum protein. Mr. Evans stated that he fed cotton seed cake containing 28 and 43 per centum protein in the spring when the range grasses became poor; but that if cattle were put in the pen and fed straight cotton seed meal, they would go blind.

According to Mr. Price, 43 per centum protein is the maximum for ordinary dairy mixture, but on the range they use as high as 50 per centum, 43 per centum being the generally accepted standard. However, if cotton seed cake containing 43 per centum protein were fed alone, digestive disturbances would result.

Dr. Pearson stated, however, that a balanced ration for beef cattle should contain between 12 and 15 per centum protein and for dairy cattle 14 to 17 per centum; that 26 or 36 per centum protein is an excessive amount; that Pasto Miel contains more protein than would be recommended even with the poorest grade of roughage; that while it is customary to feed range cattle oil cake having a protein content of over 40 per centum, that does not mean it is a balanced ration.

Nevertheless, the weight of the evidence indicates that the protein content of the instant merchandise is not so high as to be injurious to cattle, if the feed is supplemented by a low protein roughage.

The following testimony was given on the question of whether or not complete mixed feeds are generally sold commercially. Mr. Ludwick stated that very, very few mixtures are regarded as complete rations and that the only one he recalled was a feed for rabbits. Mr. Price said that a certain Purina feed constituted a complete feed in and of itself, but that he did not use it as a complete feed because his roughage was high in protein. According to Mr. Beck, a feed could be prepared that would contain all the necessary elements of a balanced ration, but ranchmen seldom buy roughage and grain mixture at the same time, since roughage is usually produced at home or near home and grain mixtures are bought from the feedstore. Dr. Pearson testified that in some sections of the country, especially California, "it is the practice in making a mixed feed to also grind up the roughage part and put it in with the grain so you would have it all mixed together and that would be a mixed balanced ration."

There is also testimony that all mixed feeds are concentrates and that if roughage were added to the sack, the contents would no longer be a concentrate. The witnesses generally understood the term "mixed feeds" to mean a combination of two or more products used for feeding livestock or poultry.

The weight of the evidence establishes that the merchandise is a mixture of bran, oil cake, molasses, and turnips, which is suitable for feeding cattle in its imported condition but which could not be properly used without supplementing it with roughage.

Is such a mixture a "mixed feed" within the meaning of the tariff act? The Government relies upon the case of *Walter Johnson* v. *United States*, 21 C. C. P. A. 129, T. D. 46464. The merchandise in that case consisted of a mixture of 95 per centum soybean oil-cake meal and 5 per centum corn meal. The testimony there indicated that it was not suitable for feed in the condition imported, but that something had to be added before it was ready for use. The court said (p. 131):

> * * * A fair construction of the statute is that the language "mixed feeds," as appearing therein, does not mean that any product is comprehended within the meaning of said terms which comprises a mixture of substances which, in themselves, might be used as components of feeds, but it should rather be construed to mean, as held by the court below, a product which, in itself, as imported, is fit for use as an animal feed.

That establishes that in order to be considered a mixed feed, the merchandise must be suitable for feeding in the condition imported, but not that it must be a complete balanced ration.

The Government calls attention to a definition of mixed feed contained in War Food Order 99, 9 Fed. Reg. 5106 (Federal Register of May 16, 1944). That definition was cited by the Court of Customs and Patent Appeals in *Corporacion Argentina de Productores de Carnes* v. *United States*, 32 C. C. P. A. 175, C. A. D. 304, as the best definition of the term "mixed feed" with which it had been made acquainted. The definition is contained in an order providing for a restriction on the use of vitamin A supplied or derived from fish oil in mixed feed, and reads as follows:

> "Mixed feed" means any mixture or combination of two or more natural or artificial feedstuffs used or intended for use in feeding livestock, poultry, fur-bearing or other animals.

Certainly, there is nothing in that definition to indicate that a mixed feed must be a complete or a balanced ration.

The dog food that was the subject of *Corporacion Argentina de Productores de Carnes* v. *United States, supra,* was a complete dog food, ready for use without further processing, and furnished a complete and satisfactory diet. However, the Government claimed that it was not a "mixed feed" because the percentage of grain was not substantial. The emphasis of the court in holding to the contrary was that the grain ingredient served a definite purpose in the mixture.

Our court of appeals then has determined that a "mixed feed" is a mixture which is fit for use as an animal feed in the condition as imported and one whose ingredients are placed therein for a definite

purpose. It has not been held that the mixture must be in and of itself a complete balanced ration.

It is apparent from the testimony, from citations from F. B. Morrison's book on "Feeds and Feeding" and from an article in the New International Encyclopaedia on feeding stuffs, that cattle feed is generally divided into two classes, roughage and concentrates. The concentrated feeds are used to furnish nutrients, especially proteins, not found in the roughage. It is obvious that farmers and ranchers who have pasture land are going to make use of their grasses and would not be interested in the purchase of a feed containing roughage. For this reason, the other nutrients needed by cattle are generally sold in the form of concentrates or mixed feeds. Just what type of nutrients a particular herd may require depends upon the type of roughage being used and whether the cattle are on the range, in the dairy, or in the feed lot. Since these facts are well known and are not contradicted by the record in this case, it can be concluded that Congress must have intended that the term "mixed feed" include concentrated mixtures containing grain and other feedstuffs which form a necessary part of an animal's diet, and not only feeds which contain a complete ration for an animal.

The instant product could not be used with all types of roughage because of its high protein content, but it could be used with a low protein roughage. The evidence establishes that cotton seed cake with a protein content of 43 per centum is commonly fed to range cattle at certain times of the year. Therefore, the instant merchandise containing 26 per centum protein could properly be used and has been used in its imported condition as a feed for livestock. While every mixture of grain and other ingredients may not be a mixed feed, we think that a product which is suitable for feeding in its imported condition and which forms a proper part of an animal's ration, if within the descriptive terms of paragraph 730, is a mixed feed within the meaning of the tariff act. The merchandise herein is held dutiable at 5 per centum ad valorem under paragraph 730 of the Tariff Act of 1930, as modified by the trade agreement with Canada (T. D. 49752) and the trade agreement with Mexico (T. D. 50797), as mixed feed.

The protests are sustained and judgment will be rendered in favor of the plaintiff.