(C. D. 1497)

JAMES LOUDON & CO. FOR TAYLOR MILLING CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided February 5, 1953)

*Lawrence, Tuttle & Harper* (*Lawrence A. Harper, George R. Tuttle, Abraham Gottfried,* and *Walter I. Carpeneti* of counsel) for the plaintiff.
*Charles J. Wagner,* Acting Assistant Attorney General (*Richard F. Weeks, William J. Vitale, Dorothy C. Bennett, Samuel D. Spector, Arthur R. Martoccia,* and *Chauncey E. Wilowski,* special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

JOHNSON, Judge: The merchandise at issue in this action was imported from Dairen, Manchuria, on March 20, 1931, invoiced as "Mixed Feed (95% Soya Cake Meal & 5% Maize Meal)." Duty was assessed thereon by the collector at the port of Los Angeles at the rate of three-tenths of 1 cent per pound under the provisions of paragraph 730 of the Tariff Act of 1930. The plaintiff claims that the merchandise is a mixed feed and should be classified under the same paragraph at the rate of 10 per centum ad valorem.

The pertinent provisions of the Tariff Act of 1930 are as follows:

PAR. 730. * * * soy bean oil cake and soy bean oil-cake meal, three-tenths of 1 cent per pound; * * * ; mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs, 10 per centum ad valorem.

At the first hearing of this case in 1940, it was stipulated and agreed between counsel for both sides that the merchandise consisted of 95 per centum soybean oil-cake meal and 5 per centum maize meal and that the appraiser's report become a part of the official record. A continuance was then granted for the purpose of agreeing to a stipulation disposing of the case.

The case subsequently was placed on the trial calendar at Los Angeles on February 25, 1943, and two witnesses for the plaintiff testified. The first witness, Herbert V. Nootbaar, manager of the plaintiff, testified that he had been in the feed business for 18 years, engaged in the purchase and sale at wholesale of feedstuffs, including mixed feeds. He purchased *material* from all over the country and sold on the Pacific coast and Hawaiian Islands primarily, occasionally

in the Midwest, the east coast, and the Gulf. He answered affirmatively the question, "Was there, on or prior to June, 1930, a definite, general, and uniform commercial understanding of the term 'mixed feeds' throughout the wholesale trade and commerce of the United States? * * * I will add, within your experience?" When asked, "What was that meaning?" the witness replied, "The combination of two or more simple feeding ingredients." When asked whether or not his testimony was limited to feedstuffs which can be fed directly to cattle, the witness replied as follows:

A. Well, inasmuch as any of the simple ingredients might be fed individually, collectively we consider any two or more as mixed feed and they, as such, could be sold to people for feeding to cattle as such.

When asked to name combinations of feedstuffs which may be put together in a mixed feed, the witness gave examples—

* * * you might use fish meal and barley, or corn and wheat, corn and linseed meal, or as many items as you might find suitable for feeds could be combined to make a mixed feed.

As to mixed feeds which are not fed directly to cattle, within his experience in the trade and commerce of the United States, the witness testified that it was quite a common practice, particularly in the Midwest, to combine any simple ingredients into a mixture that the farmer might use his own grain to supplement. The witness did not enlighten the court as to where he obtained his knowledge of the practice in the Midwest, or that such practice prevailed in March 1931 at the time of the importation of the instant merchandise, or at or before the passage of the Tariff Act of 1930.

The witness was of the opinion that the importation in question would fall within the commercial meaning of the term "mixed feed," and that it could be fed directly to cattle. He admitted, however, that he had not seen the imported merchandise. Although he had a dairy farm, the witness admitted that he had no experience in feeding either the merchandise imported or merchandise of identically the same character.

Frank L. Cross testified that he preceded the previous witness as manager of plaintiff's firm and was with the plaintiff at the time of the importation and in charge of the instant merchandise. He stated that he would testify substantially the same as the previous witness. He also admitted that he had not seen the instant merchandise used, nor did he disclose to what use the plaintiff usually devoted imported products identical with the instant merchandise.

At the next hearing in Los Angeles in 1943, Frank R. Noonan testified that he was buyer and salesman for the plaintiff since the year 1941, buying the ingredients of mixed feeds; that he had previously been employed by the International Milling Corp. located in the Mid-

dle West; and that between the years 1926 and 1931, he principally was buying grain but at times he was selling feed. The principal states in which he sold feed were Iowa, Illinois, and Missouri. He testified that in talking with dealers he had an opportunity of learning the terms used in the wholesale trade. When asked what was his understanding of the term "mixed feeds," the witness stated:

It is a mixture of any two or more ingredients, each ingredient of which is an edible feed product, a feed ingredient.

The witness was also asked whether the commercial understanding of the term "mixed feeds" agrees or disagrees with the understanding as stated by the court for the common meaning. The witness replied—

Well, it is pretty hard to give a very simple answer to that. Now, all mills have a number of specialty feeds. You can take a tonic mash that is fed for a specific purpose. Now, if that question means that a mixed feed is only a feed that can be used as the complete ration for the animal, a tonic feed that would be fed for two or three days to rid the animal of some ailment would not be a mixed feed.

On further questioning, the witness testified that under the commercial understanding of the term a, tonic feed would be a mixed feed; that the majority of so-called mixed feeds on the market rather supplement the diet, and are not the complete diet. The witness was of the opinion that a mixture of 95 per centum soybean oil-cake meal and 5 per centum maize meal would fall within the commercial definition of a mixed feed. The witness compared bran and molasses, known as Taylor's Sweet Bran, with the imported merchandise, referring to it as a tonic but within the commercial description of the term "mixed feeds." He testified that Taylor's Sweet Bran, in the general sense, was a medicine and would be harmful if fed beyond the period needed, and if he received an order for a mixed feed, he would not send a tonic. Notwithstanding such limited use, he would classify concentrates and tonics as mixed feeds. In his opinion, the term "mixed feeds" was only a general term; that in trade and commerce it was a family name for a number of commodities; that the term characterizes the products put out by the feed industry as a whole and does not apply to any one specific feed; and that an order for a mixed feed would have to be amplified because mixed feed is not bought and sold that way.

The witness further testified that soybean oil-cake meal was a rather new product to him and .that he had no personal experience with such meal "prior to about two years ago." He stated that the culture of the soybean in the United States did not commence until around 1932 and he had no knowledge when it was used in a balanced ration; and that prior to 1932, all of the soybean was imported and would have been used on the Pacific coast while not in the Middle West.

This case was next heard at the port of San Diego on October 6, 1944, when Ralph Boone testified for the plaintiff that he was a grain and feed dealer since 1921, having imported and exported and bought throughout the United States. He specified the places at which he had bought *grain* as the States of Kansas, Nebraska, Colorado, Washington, Oregon, Texas, and Illinois, very little in the East, and none in Florida. He sold principally in the southern California area. He did not testify that he had ever bought or sold "mixed feeds" in those states, nor did he specify that he had bought and sold mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs. From all that appears, he was buying grains and feeds, which would not necessarily include mixed feeds.

Upon the basis of such qualification, the witness was asked if he was familiar with the trade meaning of the term "mixed feeds" as used in the trade and commerce of the United States, to which he answered in the affirmative. He was then asked if that meaning was general, definite, and uniform throughout the United States within his experience, and the witness was of the opinion that it was generally so.

The witness also defined the commercial meaning of the term "mixed feeds" as "comprised of any two or more separate ingredients for the feeding of livestock, which would include poultry, dairy cows, beef cattle," etc.; that it need not be a balanced ration, and it did not matter whether the mixture was to be fed directly to cattle or not. The witness was of the opinion that the product here in question would not be a mixed feed, but later, under questioning, he changed his opinion. In that respect, the testimony reads:

Q. Would a mixture of 95 per cent soybean and 5 per cent corn or grain be considered a mixed feed?—A. I don't believe it would. They would call that an "admix."

Q. It would be dealt in by the mixed feed trade?—A. Yes, but it would come in as a simple in that case.

Q. What do you mean by a "simple," Mr. Boone?—A. It would be probably a concentrate containing a 5 per cent admix and in sufficient quantities to make it a mixed feed.

Q. A concentrate is one of the forms of mixed feeds, is it not?—A. It is one of the simple ingredients.

Q. One of the forms of mixed feeds?—A. That is right.

Q. It is one of the unbalanced rations which would fall into the definition?—A. Well, in 23 years I don't know yet what a balanced ration is, and I haven't found anybody that does. That is a question that scientists are still working on.

The next witness, Ray Silverthorn, testified he had been in the feed business in San Diego for 20 years, selling *feeds* more or less locally, but he had bought from most of the states in the United States, particularly west of the Mississippi River. He was unable

to testify as to the trade understanding in the whole United States, but within his knowledge he testified that the commercial understanding of the term "mixed feeds" in the wholesale trade and commerce of the United States on and prior to June 17, 1930, would include anything that would be mixed, regardless of quantities. A mixed feed, according to the witness, would include any product containing a straight commodity which was diluted or mixed with anything else, it being understood that all the ingredients were feeding ingredients. He also was of the opinion that a mixture of 5 per centum corn or some other grain and 95 per centum soybean oil-cake meal would fall within the meaning of "mixed feeds." He did not disclose whether or not he had bought and sold the imported commodity as a mixed feed.

The next hearing of this case occurred 5 years later, in 1949. At that time, three depositions on behalf of the plaintiff were submitted and read into the evidence. Commission numbered 1243 is the deposition of A. F. Seay, vice president of Ralston Purina Co., manufacturer of stock and poultry feeds for sale throughout the United States. The affiant stated that he had had experience with stock and poultry feeds since 1903; that he had bought or sold such feeds in wholesale quantities throughout the United States. The affiant further stated that in his experience the term "mixed feeds" was in use on or prior to June 17, 1930, and that the meaning thereof embraced "Any mixture of two or more ingredients from different sources," and that such meaning was definite, uniform, and general in said trade on or prior to said date. The affiant further stated that, basing his answer on his experience in the wholesale trade in the United States on or prior to June 17, 1930, a mixture of 95 per centum soybean oil-cake meal and 5 per centum of corn meal would fall within the term "mixed feeds."

Commission numbered 1245 is the deposition of George Hartman Blamberg, general manager of the Baltimore Feed & Grain Co. The affiant stated that he was engaged in buying and selling feeds, grains, feed ingredients, and manufacturing feeds for poultry and livestock; that he was experienced in stock and poultry feeds for 38 years, having been engaged in developing new formulae for feeds and in buying and selling stock and poultry feeds in wholesale quantities in the United States on or prior to June 17, 1930, his purchases and sales being confined to the eastern seaboard. The affiant further stated that in his experience in such wholesale trade the term "mixed feeds" was in use, and it meant—

When 2 or more feed ingredients are blended together the mixture is termed a mixed feed regardless of how it is to be used or fed. To be sold as a straight ingredient it would be classed as misbranded.

The affiant was also of the opinion that a mixture of 95 per centum soybean oil-cake meal and 5 per centum corn meal would come within the term "mixed feeds," as that term was used in the wholesale trade in the United States. The affiant based his answer to that question upon—

My interpretation of and understanding of both Federal and State Feed laws, as well as understanding amongst the Trade.

Commission numbered 1268 is the deposition of G. K. Jacobson of Lexington, Nebr., president of the Lexington Mill & Elevator Co. The affiant stated that he had been an officer of said company for more than 30 years and had bought and sold all kinds of grain, flour, and feeds; that the company started making stock and poultry feeds 15 years ago (about 1934) and before that, such feeds were bought and handled. The affiant stated that he had bought and sold stock or poultry feeds in wholesale quantities on and prior to June 17, 1930, in the United States, the transactions being confined to central Nebraska. In his experience, the term "mixed feeds" was in use on and prior to June 17, 1930, and the meaning of such term, as interpreted by his company, was "any product that consisted of more than one feed stuff ingredient." Within his personal experience and practice in the purchase and sale of mixed feeds, the affiant was of the opinion that a mixture of 95 per centum soybean oil-cake meal and 5 per centum corn meal would fall within the term "mixed feeds," as used in the wholesale trade in the United States on or prior to June 17, 1930. The affiant further stated that there were no particular feed standards to be followed in the preparation of mixed feeds, but that such standards varied from mill to mill.

The case was then continued from time to time on behalf of the Government until the early part of 1952, when it was submitted upon the record without the introduction of any further evidence.

The question of the proper classification of a mixture of 95 per centum soybean oil-cake meal and 5 per centum maize or corn meal has been before this court on three previous occasions, and the construction of the term "mixed feeds" in paragraph 730 arose in several other cases. In the case of *Walter Johnson* v. *United States*, 62 Treas. Dec. 473, T. D. 45975, all of the witnesses testified that the commodity known as soybean oil-cake meal was a feed and was generally mixed with other materials, and three of the witnesses also testified that corn meal is likewise a feed. Plaintiff's counsel in that case attempted to prove that the merchandise came within the trade understanding of the term "mixed feeds," but, as their experience was limited to one section of the country only, the court held that there was a failure of proof in that respect. The court stated, as to the imported product, as follows:

We have before us a commodity consisting of an admixture of corn meal, a grain product, and soybean oil-cake meal. If this commodity is in fact a mixed seed it would fall squarely within the provision. It, therefore, appears to be a material used in the making of mixed feeds, to which something else must be added before it is ready for use. It is axiomatic that merchandise is dutiable in the condition as imported. An imported commodity which requires the addition of some other ingredient or ingredients before it is ready for use as a mixed feed would not, in our judgment, fall within the provision for mixed feeds.

Upon appeal, *Walter Johnson* v. *United States*, 21 C. C. P. A. (Customs) 129, T. D. 46464, the Customs Court was affirmed, the appellate court stating:

We agree with the conclusion of the trial court. The testimony that was offered as to the trade or commercial designation of the imported goods did not comply with the rule which has been stated by us on numerous occasions, that the trade or commercial designation must be established by a preponderence of the evidence, and must be definite, uniform, and general, and not local, partial, or personal. * * * The witnesses testified, in so far as it affected a possible commercial designation, only as to trade meaning in certain States along the Pacific coast. This is not sufficient to establish a commercial designation of a term which shall be applied in the administration of a statutory provision which must be Nationwide in its application.

* * * A fair construction of the statute is that the language "mixed feeds," as appearing therein, does not mean that any product is comprehended within the meaning of said terms which comprises a mixture of substances which, in themselves, might be used as components of feeds, but it should rather be construed to mean, as held by the court below, a product which, in itself, as imported, is fit for use as an animal feed.

In the case of *Thornley & Pitt* v. *United States*, 65 Treas. Dec. 1365, Abstract 27331, also involving an importation consisting of 95 per centum soybean oil-cake meal and 5 per centum maize meal, the court stated that the plaintiff had undertaken to overcome the effect of the *Johnson* case, *supra*, by attempting to prove that the commodity was commercially known as a mixed feed and also that it actually was fed to stock in the condition as imported. The court was of the opinion, however, that there was a failure of proof on the question of commercial designation. On the question of use of the imported product as a mixed feed, it was observed that neither of the witnesses had ever been engaged in the feeding of stock.

A rehearing was granted in that case, *Thornley & Pitt* v. *United States*, 70 Treas. Dec. 520, T. D. 48596. There, the court considered whether or not the evidence established that the commercial designation of the term "mixed feeds" embraced a substance different from the mixed feeds described in paragraph 730. The plaintiff introduced into evidence the depositions of five new witnesses, among whom were A. F. Seay, G. H. Blamberg, and G. K. Jacobson (who also testified by deposition in the pending case).

As to the testimony of these additional witnesses, the court stated that—

It is worthy of observation that none of these witnesses gave any testimony concerning the sale of any commodity comparable to the importation here involved. From the fact that no such testimony was adduced, it is a fair inference that this merchandise was not on the markets with which any of these witnesses were acquainted.

In commenting further upon the additional evidence adduced, the court stated:

* * * The most we can say for this proof is that it establishes, if accepted at full face value, the fact that mixed feed consisted of two or more ingredients. There is testimony also to the effect that such a commodity as here involved could be fed to cattle. Such testimony does not establish, in our opinion, that the term "mixed feed" had acquired in the trade a different meaning than the common one. It has been defined by the Court of Customs and Patent Appeals. It is axiomatic that in construing the tariff statute the court should endeavor to determine the intent of Congress in its use of language involved. The intent of Congress in its use of the term "mixed feed" in paragraph 730 of the tariff act, has been determined for us by the Court of Customs and Patent Appeals in the case of *Walter Johnson* v. *United States*, 21 C. C. P. A. 129, where the court said in substance that mixed feed is a product which in itself as imported, is feed for use as an animal feed. We know of no decision which has held that a mixed feed must be made up of three or more ingredients, and, therefore, evidence that the trade and commerce call any feed a mixed feed which contains two or more feed ingredients, fails to establish that the trade has adopted a different meaning for the words "mixed feed" to that used in the statute as interpreted by the court.

It is also noted that a mixed feed must be a feed fit for use as an animal feed. Proof that a commodity made up of 95 per centum soya bean oil-cake meal and 5 per centum corn meal could be fed to cattle tends to establish, if accepted as true, that it is fit for use as an animal feed. Such proof, if given any weight at all, would not establish commercial designation, nor do we believe it was offered for that purpose.

\* \* \* \* \* \* \*

It is our opinion that commercial designation has not been established, and that the testimony of witnesses who disclosed only sales experience to the effect that a commodity like the instant one could be fed to live stock cannot be given much weight against a witness scientifically trained in feeding stock and one of years of practical experience along the same line who states that the commodity is not "fit for use as an animal feed."

Upon a rehearing again being granted, there was no change in the decision of the court. See *Thornley & Pitt* v. *United States*, 73 Treas. Dec. 1127, Abstract 37737.

The witnesses who testified by deposition in the *Thornley & Pitt* case, *supra*, were asked substantially the same questions as in the case at bar, and they gave substantially the same answers. We are of the opinion that the court's analysis of such testimony in that case applies equally to their testimony in the pending case.

In the case of *Albers Bros. Milling Co.* v. *United States*, 6 Cust. Ct. 328, C. D. 490, the merchandise at issue was a mixture of 95 per

centum soybean oil-cake meal and 5 per centum corn meal. The court stated that the witnesses testified that the product in that case could be used as a feed as imported, but the predominate use was shown to be as a component part of feed; that it was used to raise the protein content of grains and other feeds. The court further stated that—

* * * The witnesses in their testimony as to the instant commodity were discussing in almost all instances "soybean oil cake meal," and the fact that the product here involved contained 5 per centum corn meal seemed to be of little consequence in their opinion. For instance, the witness Cox testified that the presence of the corn meal "would not prevent" the importation from being used for any purpose for which soybean oil cake meal is used. The witness Clulow stated that the addition of 5 per centum corn meal "would not destroy" the use of soybean oil cake meal. It would seem, therefore, from this record that the corn meal content is inconsequential so far as the use of the commodity is concerned.

The court held that the plaintiff had failed to overcome the presumption of correctness attaching to the collector's classification and that the evidence failed to convince the court that the earlier finding as to this same kind of merchandise was erroneous.

In the case of *Corporacion Argentina de Productores de Carnes* v. *United States*, 32 C. C. P. A. (Customs) 175, C. A. D. 304, involving the classification of certain dog food, the appellate court stated:

The lexicographers have afforded us no definition of "feedstuffs," although the meaning of the words "feed" and "stuff" are defined and well understood. The best definitions of the terms "mixed feeds" and "feedstuffs" with which we have been made acquainted, are in War Food Order 99, 9 Fed. Reg. 5016, where these terms are defined as follows:

"Mixed feed" means any mixture or combination of two or more natural or artificial feedstuffs used or intended for use in feeding livestock, poultry, fur-bearing or other animals.

"Feedstuff" means any material or substance used or intended for use in the feeding of livestock, poultry, fur-bearing animals or other animals for any purpose whatever.

In the case of *Southwestern Sugar & Molasses Co.* v. *United States*, 18 Cust. Ct. 128, C. D. 1056, involving cattle feed, the court stated:

* * * While every mixture of grain and other ingredients may not be a mixed feed, we think that a product which is suitable for feeding in its imported condition and which forms a proper part of an animal's ration, if within the descriptive terms of paragraph 730, is a mixed feed within the meaning of the tariff act.

It will be observed from the foregoing decisions of this court and the Court of Customs and Patent Appeals that the tariff provision for "mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs" has been judicially defined. It has been held that in the use of the term "mixed feeds" the intent of the Congress, in writing the measure into the tariff act, was to provide for a product suitable in its imported condi-

tion for feeding purposes, such as forms a proper part of an animal's ration.

Counsel for the plaintiff contends that the evidence establishes that there was a definite, uniform, and general meaning in the trade and commerce of the United States for the term "mixed feeds" on and prior to June 17, 1930, which includes a mixture of 95 per centum soybean oil-cake meal and 5 per centum maize meal, and that such commercial meaning differs from the common meaning in the particular that it need not be fed directly.

Counsel for the Government contends that the evidence has failed to prove that the imported merchandise is a mixed feed in a tariff sense for the reason that there is a failure to establish that the imported commodity was commercially designated and sold in the trade as a mixed feed; or that commercially there is any feed known as a mixed feed.

From the character of evidence adduced in this case, it appears that an attempt was made to extend, by the means of commercial testimony, the common import of the words "mixed feeds" in order to include the imported merchandise, rather than to establish by such commercial testimony that the imported merchandise, although not within the interpretation by the courts of the term "mixed feeds," was in the trade and commerce known and bought and sold as mixed feed.

To accomplish this result, counsel for the plaintiff has attempted to establish by commercial witnesses that mixed feeds generally consist of feedstuffs which are mixed together for the purpose of feeding livestock and poultry; that such term is regarded definitely, uniformly, and generally throughout the wholesale commerce of the United States as pertaining to two or more feeding ingredients which when mixed together may or may not be fed directly. In other words, these witnesses expressed the opinion that ingredients contained in a mixture designed to be ultimately fed as a mixed feed, even though not fed directly, nevertheless, constitute a mixed feed, if containing two or more feedstuffs. The witnesses then expressed the opinion that the imported commodity was within the meaning of such commercial definition of a mixed feed.

The particular class of mixed feeds provided for by Congress in paragraph 730 embraces many combinations of feedstuffs, at least one of which is required to be a grain. The provision does not, by its very context, intend that articles embraced therein should be bought and sold under such tariff designation without a more specific enumeration. As stated by one of the witnesses, an order for mixed feeds could not be filled for the reason that such designation would not disclose what was wanted. There is no need to comment here, in view of our decision herein, whether or not it might have been

established by means of commercial testimony that the courts erred in construing the mixed feeds provision to have been intended by Congress to apply only to mixed feeds which were ready for use at the time of importation, as the context itself would suggest, without attempting to establish that the imported article in question was so commercially bought and sold.

It is abundantly clear in that regard that none of the witnesses had ever seen the imported merchandise nor bought and sold merchandise of the identical character, nor had any experience in feeding a commodity composed of 95 per centum soybean oil-cake meal and 5 per centum maize meal.

These witnesses were not asked if the imported product in issue was known to them, and bought and sold by them, in the trade and commerce of the United States as a mixed feed. Nor was it established that any of these witnesses had ever bought and sold at wholesale goods similar to the product in question, or were in any way commercially familiar with it. Nevertheless, they all testified that it would be bought and sold commercially throughout the United States as a mixed feed. However, they did not testify to the name under which this commodity was bought and sold.

It is for the court to decide from the evidence of commercial men who buy and sell the imported product in the markets of this country whether or not it would come within the tariff description of "mixed feed," and testimony which is based solely upon opinion evidence, even though such testimony was elicited from witnesses engaged in the grain and feed business, without a showing of any actual experience in buying and selling the product in question, is not convincing.

The designation of the commodity upon the invoice as "mixed feeds" is not sufficient to make it a mixed feed. See *United States* v. *Macy & Co.*, 7 Ct. Cust. Appls. 8, T. D. 36256. In order to produce uniformity in the imposition of duties, the classification of articles must be ascertained by an examination of the imported article itself, in the condition in which it is imported, *Worthington* v. *Robbins*, 139 U. S. 337, and what the importer may or may not use the imported material for at the time of the importation has no relevancy to the issue of the meaning of the tariff designation at the time of the enactment of the tariff act. *Goldsmith's Sons* v. *United States*, 13 Ct. Cust. Appls. 69, T. D. 40932.

The common meaning of a tariff term, having been judicially determined, will be adhered to by the courts until a legislative change in the statutory enactment in question necessitates a changed determination of such meaning. See *United States* v. *North American Mercantile Co.*, 17 Ct. Cust. Appls. 378, T. D. 43820; *United States* v. *Sheep Shearers Mdse. & Comm. Co.*, 23 C. C. P. A. (Customs) 146, T. D. 48009.

However, the foregoing principle would not preclude establishing by means of commercial testimony that a commodity consisting of 95 per centum soybean oil-cake meal and 5 per centum maize meal, even though not ready for use at the time of importation for feeding purposes, was, nevertheless, at the time of the passage of the Tariff Act of 1930, bought and sold at wholesale in the trade and commerce of the United States uniformly, definitely, and generally by the terms contained in the statute (*200 Chests of Tea, Smith, Claimant*, 9 Wheat. 430; *M. & B. Miller, Inc.* v. *United States*, 28 Cust. Ct. 195, C. D. 1410; *United States* v. *D. L. Moss & Co.*, 22 C. C. P. A. (Customs) 249, T. D. 47159). Commercial designation, however, may be established in certain instances even though the goods are called by a subordinate name in actual transactions, providing it is also proved that the goods are commercially regarded as within the class of goods covered by the tariff term. *Drew* v. *Grinnell*, 115 U. S. 477. But what name an imported article falls within the meaning of is a question of fact. *Mendelson* v. *United States*, 1 Ct. Cust. Appls. 346, T. D. 31451.

In the case of *United States* v. *Globe Overseas Corporation*, 13 Ct. Cust. Appls. 10, T. D. 40849, certain novelty rubber sponges in the form of dogs, Santa Claus, clowns, etc., were assessed for duty as toys. The articles were claimed properly dutiable as manufactures of india rubber, not specially provided for. The court was of the opinion that the record showed the amusement which children derived from the articles was incidental to the utilitarian purpose and use to which the articles were put and for which they were designed. The Government attempted to establish by commercial testimony that a class of articles manufactured in the United States of material similar to some extent to that of which the imported articles were made, but of different shapes and designs, was known in the trade as "toys," in order to prove the commercial designation of the imported articles. The court was of the opinion, however, that the testimony failed to show that the witness had ever bought or sold merchandise which was in any respect similar to the imported articles, except as to the material of which it was composed, and there was no evidence that the domestic merchandise was ever used in substantially the same manner, or for the same purposes for which the imported articles were used. The court held that there was a failure of proof of a commercial designation.

In the case of *United States* v. *Schoemann & Mayer*, 17 C. C. P. A. (Customs) 349, T. D. 43778, involving papier-mâché dogs, where the classification as toys was attempted by the Government to be sustained, the court stated:

\* \* \* We have frequently indicated the character of proof which ought to be required to show commercial designation in tariff classification. Suffice it to

say that the requirements are not met by testimony, as in the case at bar, to the effect that toys belong to a class of merchandise sold at wholesale in 1922 which was commercially considered as toys, definitely and uniformly, and that the papier-mâché dog belonged to that class.

In a case of this character where it is claimed that the commercial meaning of a term differs from its common meaning, the fact to be elicited from the witness is how the article is designated, named, or called in the trade. If it is not called, designated, or named a toy, how could a commercial designation of "toy" be established?

The shortcoming of this character of proof and its lack of probative effect was, we think, most aptly illustrated in this court recently by a colloquy which occurred between a lawyer and a member of the court, when this same phase of proof of commercial designation was under consideration. Pointing to a gold finger ring which the lawyer was using in illustrating what jewelry meant commercially, the judge asked: "Why do you not ask him what that article is called in the trade." The lawyer replied: "The trouble with that kind of question is, he would answer, 'It is called a ring.'"

It seems plain that if, in the trade, it was always called a ring and designated as a ring, and that it was not called or designated as jewelry, the article had no commercial designation as jewelry. If the witness never knew of its being called jewelry but had always heard it called a ring, certainly his testimony as to commercial designation of the term "jewelry" would have no probative value.

Following this line of reasoning in the instant case, if the witness had been asked, "What is this papier-mâché dog called?" he would probably have answered, "A papier-mâché dog," or "cotton-cloth dog," or "dog." If he had replied that it was called a toy, abundant opportunity for cross-examination as to where and when he had heard it spoken of or designated as a toy would have been afforded, which might have elicited the fact that he had never heard it called a toy but that from his own definition of a toy he regarded it as such.

The appellate court held upon the basis of such evidence that the Government had failed to prove that the article was known and designated in the trade generally as a toy.

We have a similar situation in the pending case.

As previously stated, the evidence was adduced for the purpose of establishing abstractly to what sort of goods the term "mixed feeds" applies, and whether or not it is solely confined to a product ready for use for feeding purposes. There is an absence of evidence in the record which would tend to establish that although the imported product did not come within the meaning of the term as announced by the courts, it, nevertheless, was bought and sold at wholesale throughout the United States as a mixed feed at the time of the passage of the Tariff Act of 1930.

In view of such failure of proof, and for the reasons heretofore stated, judgment will be entered in favor of the defendant.