146

Ａｍｅｒｉｃａｎ Ｃｕｓｔｏｍｓ Ｂｒｏｋｅｒａｇｅ Ｃｏ., Ｉｎｃ., ａ/ｃ Ａｌｂｅｒｓ Ｍｉｌｌｉｎｇ Ｃｏｍｐａｎｙ *v.* Ｕｎｉｔｅｄ Ｓｔａｔｅｓ

Court No. 73–3–00796

(Decided April 30, 1976)

*Glad, Tuttle & White* (*Edward N. Glad* and *Steven W. Baker* of counsel) for the plaintiff.

*Rex E. Lee*, Assistant Attorney General (*Robert Masters* and *Ira J. Grossman*, trial attorneys), for the defendant.

Re, Judge: The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise produced in Canada, and entered at the port of Honolulu, Hawaii.

The merchandise consists of grain screening pellets used as animal feed. It was classified as animal feeds, and ingredients therefor, not specially provided for, other, under item 184.75 of the Tariff Schedules of the United States, [TSUS], as modified by T.D. 68–9. Consequently, it was assessed with duty at the rate of 8 per centum ad valorem.

Plaintiff contests that classification, and claims that it should have been classified as animal feeds, and ingredients therefor, not specially provided for: byproducts obtained from the milling of grains, mixed feeds, and mixed-feed ingredients, under item 184.70, TSUS, as modified by T.D. 68–9. Hence, plaintiff maintains that the merchandise should have been admitted duty free.

The following are the pertinent provisions of the tariff schedules as modified by T.D. 68–9:

Classified under:

Schedule 1, Part 15, Subpart C:

"Animal feeds, and ingredients therefor, not specially provided for:

\* \* \* \* \* \* \*

184.75      Other\_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_      8% ad val."

Claimed under:

Schedule 1, Part 15, Subpart C, Headnote 1:

"For the purposes of this subpart—
(a) the term 'animal feeds, and ingredients therefor' embraces products chiefly used as food for animals, or chiefly used as ingredients in such food, respectively, \* \* \*
(b) the terms 'mixed feeds' and 'mixed-feed ingredients' in item 184.70 embrace products which are admixtures of grains (or products, including byproducts, obtained in milling grains) with molasses, oil cake, oil-cake meal, or other feedstuffs, and which consist of not less than 6 percent by weight of the said grains or grain products."

Schedule 1, Part 15, Subpart C:

"Animal feeds, and ingredients therefor, not specially provided for:

\* \* \* \* \* \* \*

| 184.70 | Byproducts obtained from the milling of grains, mixed feeds, and mixed feed ingredients_____ | Free" |

Also pertinent is General Interpretative Rule 10(e) which provides:

"(e) in the absence of special language or context which otherwise requires—
(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;"

The record reveals that the grain screening pellets at bar are made from the byproducts of the cleaning of various types of grain. The byproducts are the screenings and dust taken from the pollution filters, and include small particles of grain, broken pieces of grain, and chaff. These grain screenings, as they are called, are pulverized, compressed, and mixed with steam and a binder or binding agent, to form the pellets. The mixing and binding process is accomplished in a pelletizing machine.

The binder or binding agent used in the making of the pellets is called "Lignosite," a trademark owned by the Georgia-Pacific Corporation. It is prepared in different forms for various commercial markets, and can be either liquid or a dry powder. The liquid form, liquid calcium lignosulfonate, is known commercially as "LLS."

A summary of the components and uses of the "LLS Pellet Binder" are found in a technical bulletin published by Georgia-Pacific. It is a liquid byproduct of the production of paper from wood cellulose, and is advertised as a feed pellet binder derived or extracted from "spent sulfite liquor." It comprises about one half of one percent of the weight of the pellets at bar which are produced by the firm, Pacific Elevators.

The claimed duty free category, within item 184.70, applies to "[b]yproducts obtained from the milling of grains, mixed feeds, and mixed-feed ingredients." By virtue of headnote 1(b), *mixed feeds* must consist of an admixture, not less than 6% by weight, of grains, or byproducts obtained from the milling of grains with "molasses, oil cake, oil-cake meal, or other feedstuffs."

Plaintiff summarizes its position by stating that the "product at bar includes grains and grain products in which the grain content is over 6% by weight, and the modified calcium lignosulfonate preparation known as 'LLS'." Asserting that "LLS" is "other feedstuffs" within the meaning of the headnote, it concludes that the imported

merchandise meets the prescribed requirements, and should therefore be classified under item 184.70, and admitted duty free.

The defendant agrees that a product to be classified as "mixed feed" under item 184.70 must consist of not less than 6% by weight of grains, but contends that there is "no evidence that the subject merchandise fulfills this requirement." The defendant also agrees that in addition to the grain ingredients, a "mixed feed" under item 184.70 must contain "molasses, oil cake, oil-cake meal, or other feedstuffs." It is its position, however, that the "LLS," admittedly the binder or pellet binding agent used in the subject merchandise, is not "other feedstuff." Consequently, the defendant maintains that the imported merchandise "cannot properly be classified under item 184.70 *supra*, and was correctly classified under item 184.75."

Several cases decided under the predecessor provision found in the Tariff Act of 1930 shed some light upon the legal issue presented. Paragraph 730 of the Tariff Act of 1930 provided for "by-product feeds obtained in milling wheat or other cereals," and for "mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs."

In *Cia. Mexicana de Malta, S.A.* v. *United States*, 69 Treas. Dec. 729, T.D. 48273 (1936), this court, based upon the language of the 1930 tariff provision, held that a mixture of only one grain did not qualify for classification as "mixed feeds." Even though the merchandise consisted of ground small grains and cracked grains of barley, the court stated that "[i]t is clear that the only grain involved in the product before us is barley." 69 Treas. Dec. at 731 Additionally, the court indicated that the product could not have been classified as "mixed feeds" because: "There is not, however, any oil cake, oil-cake meal, molasses, or other feedstuffs in the mixture." *Ibid.*

In *United States* v. *F. W. Myers & Co., Inc.*, 29 CCPA 34, C.A.D 168 (1941), also decided under paragraph 730, the appellate court held that a mixture of several products consisting of grain or grain products, but without any "oil cake, oil-cake meal, molasses or other feedstuffs," did not qualify as "mixed feeds." The court indicated clearly that:

> "the statute does not provide for 'mixed feeds' consisting of an *admixture of grains or grain products*, but, on the contrary, provides for 'mixed feeds, consisting of an admixture of grains or grain products *with* * * * *other feedstuffs*,' that is, feedstuffs other than grains or grain products, including 'oil cake, oil-cake meal' and 'molasses.' " (Emphasis in original.) 29 CCPA at 38.

The appellate court consequently reversed the determination of this court that had held the mixture of grain products, without "other feedstuffs," dutiable as "mixed feeds."

Other cases show that the imported "mixed feed," in its imported condition, must be fit for use as an animal feed, although it need not necessarily be a complete or balanced ration. *Walter Johnson* v. *United States*, 21 CCPA 129, T.D. 46464 (1933); *Southwestern Sugar & Molasses Co.* v. *United States*, 18 Cust. Ct. 128, C.D. 1056 (1947). As stated in the *Southwestern Sugar & Molasses* case, "Congress must have intended that the term 'mixed feed' include concentrated mixtures containing grain and other feedstuffs which form a necessary part of an animal's diet, and not only feeds which contain a complete ration for an animal." 18 Cust. Ct. at 134.

Paragraph 730 of the Tariff Act of 1930 did not contain a provision which required any particular percentage of grain or grain products. As a result of the case of *Corporacion Argentina de Productores de Carnes* v. *United States*, 32 CCPA 175, C.A.D. 304 (1945), which required merely that the percentage be "substantial," Congress added the "not less than 6 percent by weight" requirement in headnote 1(b).

In the case at bar the parties are in agreement that item 184.70 of the tariff schedules requires an admixture of both grains and other feedstuffs. See *Mary G. Ricks* v. *United States*, 11 Cust. Ct. 128, C.D. 809 (1943), *aff'd*, 33 CCPA 1, C.A.D. 308 (1945); *Mary G. Ricks* v. *United States*, 7 Cust. Ct. 63, C.D. 535 (1941).

Plaintiff asserts that the imported merchandise "meets all of the grain requirements" for classification as "mixed feeds." It urges that the "other aspect of the requirements for classification as a mixed feed is the inclusion of 'molasses, oil cake, oil-cake meal, or other feedstuffs'," and that "LLS" is an "other feedstuff."

Defendant denies that "LLS" is an "other feedstuff," and contends that plaintiff "has failed to carry its burden of proving chief use of LLS as a feedstuff." See General Interpretative Rule 10(e)(i); see also schedule 1, part 15, subpart C, headnote 1(b) (*supra*).

The plaintiff states the question presented as follows:

"Is the binding agent liquid lignosulfonate, commercially known as 'LLS', used in the production of the imported pellets, included within the meaning of the term 'other feedstuffs' in Headnote 1(b) of Schedule 1, Part 15, Subpart C, TSUS?"

In its reply brief plaintiff states that "the merchandise has already been classified as animal feed and ingredients therefor under item 184.75 and thus is presumed to fall within the definition of these terms in headnote 1(a), Subpart C, Part 15, of Schedule 1, TSUS as being chiefly used as food for animals or chiefly used as ingredients in such foods." It is to be noted, however, that the product classified by the customs officials is the *grain screening pellet* which was found to be an animal feed. All that may be presumed from that classification is

that the entire pellet, made up of byproducts from the cleaning of various types of grain, is chiefly used as a "food for animals." Plaintiff cannot rely on the customs classification as a determination that each of the ingredients of the grain screening pellet, including the binding agent, "LLS," is in itself a product "chiefly used as food for animals."

For plaintiff to prevail under the claimed classification, it must prove that the pellet consists of an admixture of grains, or products, including byproducts, obtained in the milling of grains, "with molasses, oil cake, oil-cake meal, or other feedstuffs." Admittedly, molasses, oil cake and oil-cake meal are feedstuffs, but the pellet does not contain any of them. The question, therefore, is whether "LLS" is an "other feedstuff," and, if it is, whether the pellet consists of not less than 6% by weight of grains or grain products.

On this record the court finds that plaintiff has not succeeded in bearing its burden of proof that the pellet binder, or binding agent "LLS" is included in "other feedstuffs" for classification under item 184.70. A contrary finding would do violence to the presumption of correctness that attaches to official administrative action, which, in customs classification cases, has been codified by the Customs Courts Act of 1970. 28 U.S.C. § 2635(a). At this late date, no citation is required for the principle that the classification of the customs officials is presumed to be correct, and that, in order to prevail, plaintiff must bear a dual burden, viz., it must establish that the customs classification is incorrect, and that the claimed classification is correct. Plaintiff has failed to meet this burden.

To qualify as "mixed feeds" the admixture of grains or byproducts must be "with molasses, oil cake, oil-cake meal, or *other feedstuffs* * * *." (Emphasis added.) The doctrine of *ejusdem generis* is usually helpful to determine the meaning of general words which follow a specific enumeration. In this case the general words, "other feedstuffs," follow the specific enumeration of "molasses," "oil cake," and "oil-cake meal." The only case where reference was made to the application of this doctrine of statutory construction to the words "other feedstuffs" is *Corporacion Argentina de Productores de Carnes* v. *United States*, 32 CCPA 175, C.A.D. 304 (1945). The court, in that case, uttered the following dicta:

> "The rule which requires that, in determining the classification of an imported article under a general clause which follows specifically enumerated articles, they all should be regarded as of the same class, we think, cannot be urged as a controlling consideration here. The specific enumerations preceding the general clause 'or other feedstuffs' are oil cake, oil-cake meal, and molasses. It would seem there is about as much difference between molasses and oil cake or oil-cake meal as there is between a mixed meat, cereal, and vegetable product and molasses.

In other words, the enumerated articles belong to no single general class, except insofar as they are feedstuffs." 32 CCPA at 184–85.

Even assuming the correctness of the statement that the "enumerated articles belong to no single general class," the determination must nevertheless be made whether "LLS" is included in "other feedstuffs."

*Webster's Third New International Dictionary of the English Language* defines "feedstuff" as "a feed for domestic animals; *usu:* any of the constituent nutrients of an animal ration."

In the *Corporacion Argentina* case, which was decided by the Court of Customs and Patent Appeals in 1945, the court concluded that the term "feedstuffs," under the Tariff Act of 1930, included feeds for dogs. The court stated:

"The best definitions of the terms 'mixed feeds' and 'feedstuffs' with which we have been made acquainted, are in War Food Order 99, 9 Fed. Reg. 5016, where these terms are defined as follows:

'Mixed feed' means any mixture or combination of two or more natural or artificial feedstuffs used or intended for use in feeding livestock, poultry, fur-bearing or other animals.

'Feedstuff' means any material or substance used or intended for use in the feeding of livestock, poultry, fur-bearing animals or other animals for any purpose whatever." 32 CCPA at 183.

What may be gathered from these sources is that a "feedstuff" may be any product used or intended to be used to feed animals. Clearly, the product must itself be an animal feed.

The court finds that the previous definitions do not include a product used to form or bind a feed for animals. "LLS" is not used to feed animals, but is used to bind byproducts from the cleaning of various types of grain, and make pellets better suitable for their use as feed for animals. Plaintiff has not established that "LLS" is itself a feedstuff. Despite plaintiff's claim that "LLS" has some food value, it did not prove that "LLS" is used as "animal feed," as are molasses, oil cake, oil-cake meal or other feedstuffs.

Although the words "other feedstuffs" were in the Tariff Act of 1922, only meager guidance is offered by cases decided under that act. Additionally, no case has been found which has dealt with lignosulfonate or any of the other similar products referred to in the present case.

Since "LLS" is not one of the products enumerated in the pertinent headnote, plaintiff asserts that it serves to replace one of those named, viz., molasses. The evidence, however, does not permit such a finding. The reliable testimony reveals that molasses is not used as a binder and that "LLS" is not used for its food value. On the record, therefore,

any claim that "LLS" is "other feedstuff" because of its alleged similarity to molasses, is untenable.

Plaintiff stresses that "LLS" has some food value, and that, however "small" or "low," it is "not of such negligible quantity that it can be ignored under the *de minimis* rule." It adds that "[l]ignin sulfonates are registered as food additives with the Food and Drug Administration * * *, and are provided for in 21 CFR 121, 234 (1971 edition) covering use as a pelleting aid, binding aid, surfactant, and as a *source of metabolizable energy*." (Emphasis in original.) Registry, or permission for their use as food additives, however, does not justify the conclusion that lignin sulfonates in general, or "LLS" in particular, are "other feedstuffs" within the meaning of the pertinent headnote. The evidence of record designed to show that "LLS" was also used as a "source of metabolizable energy" is wholly inadequate to support a finding that it is a "feedstuff" or "other feedstuff" under item 184.70 of the tariff schedules.

All of the witnesses indicated with crystal clarity that the purpose or reason for the use of the "LLS" was to form or bind the pellet. Indeed, both of plaintiff's witnesses dispelled all doubts on this crucial question. Their testimony, on the essential nature and purpose for the use of "LLS," is conclusive. "LLS" is "a feed binder" used to bind the pellet and make a "firmer" pellet. It is a product made "for binding purposes to make a better pellet." There is no evidence to permit a finding that it is "animal feed" or a "feedstuff."

In addition to the testimony of the witnesses, technical bulletins of Georgia-Pacific on "Lignosite" and lignin chemicals also describe the "LLS Pellet Binder," "Perma-Pel," and "Lignosite 50%, Neutralized." The bulletin on the "LLS Pellet Binder," in part, describes it as follows:

> "Georgia-Pacific LLS is a refined calcium lignosulfonate especially designed for use as an animal and poultry feed pellet binder. LLS is approved for use in feed preparations by the FDA up to 4% by weight on a solids basis. LLS has a metabolizable energy level comparable to many ingredients it would replace in the formula. Palatability and ingestion are not affected.
> Pellets containing LLS consistently achieve greater durability than untreated pellets or pellets using dry binders."

"Perma-Pel," a dry or solid form of lignosulfonate, is described as "a refined calcium lignosulfonate manufactured within close specification for use as an animal and poultry feed pellet binder. Use of Perma-Pel allows manufacture of more durable pellets * * *."

The record indicates that, notwithstanding the difference in names, and the addition of a "small amount of surface active [surfactant] agent," LLS is "identical" to "Lignosite 50%, Neutralized." Mr. Watson, a witness for the plaintiff and a manager of market develop-

ment for the Georgia-Pacific Corporation, testified that the two products are the same, and "would differ only in the addition of the surfactant."

Mr. Baum, a witness for the defendant, and an expert "in the field of lignosulfonate chemistry," agreed that LLS and Lignosite 50%, Neutralized were "basically * * * the same product with a different label." When asked if he knew of "any other uses aside from use as a pellet binder during 1971 to which liquid lignosulfonate was put," Mr. Baum replied: "Linoleum mastic adhesive and in the concrete industry."

The technical bulletin on "Lignosite 50%, Neutralized," under the heading "Uses," states:

> "Lignosite 50%, Neutralized is an anionic material which lends itself to a variety of applications. Major applications include the following industries:
>
> | Cement | Ceramics |
> | Gypsum Board | Structural Clay |
> | Adhesive | Refractories" |

Upon the record presented the court can only conclude that "LLS" is precisely what it is advertised to be in the Georgia-Pacific technical bulletin, viz., a "pellet binder." As stated in the technical bulletin it is "specially designed for use as an animal and poultry feed pellet binder." It is not "an animal and poultry feed." It is "an animal and poultry feed *pellet binder*." (Emphasis added.)

All of the evidence, exhibits and testimony show clearly that "LLS" is a pellet binder or binding agent. Apart from unsubstantiated factual assertions, there is nothing in this record that would justify a finding that "LLS" is "other feedstuffs," within the meaning of the pertinent headnote, as claimed by the plaintiff. Plaintiff has not succeeded in proving that "LLS" is "other feedstuffs," as required by the headnote, and its claim for classification of the imported merchandise under item 184.70 of the tariff schedules must fail.

In view of this court's finding that plaintiff has not proven that "LLS" is an "other feedstuff" within the pertinent headnote, it is not necessary to pass upon defendant's assertion that "plaintiff has not carried its burden of proof with respect to the 6% requirement of item 184.70, TSUS."

Since plaintiff has failed to meet its burden of proof in establishing that the imported merchandise satisfies a statutory requirement for classification under item 184.70 of the tariff schedules, the claim is overruled, and the customs classification under item 184.75 is sustained.

Judgment will issue accordingly.