UNITED STATES *v.* M. & D. MILLER, INC. (No. 4751)[1]

United States Court of Customs and Patent Appeals, March 23, 1954

*Warren E. Burger*, Assistant Attorney General (*William J. Vitale*, special attorney, of counsel), for the United States.

*Barnes, Richardson & Colburn* (*J. Bradley Colburn, James F. Donnelly*, and *Eugene F. Blauvelt* of counsel) for appellee.

*Lamb & Lerch* (*David A. Golden* of counsel) *amici curiae*, for appellant.

[Oral argument December 10, 1953, by Mr. Vitale, Mr. Golden, and Mr. Blauvelt]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges

COLE, Judge, delivered the opinion of the court:

Protesting the decision of the Collector of Customs in classifying an importation of earthenware teapots under the provisions of paragraph 211 of the Tariff Act of 1930 [19 U. S. C. sec. 1001, Par. 211] as decorated earthenware, the importer sought reversal of the collector's action specifically claiming that the merchandise was properly dutiable *eo nomine*, as Rockingham earthenware in accordance with paragraph 210 of said Act as modified by T. D. 49753, the trade agreement with the United Kingdom, 74 Treas. Dec. 253, effective January 1, 1939. The United States Customs Court, Third Division, sustained the importer's protest and the United States has appealed from that decision. *M. & D. Miller, Inc.* v. *United States*, 28 Cust. Ct. 195, C. D. 1410.

The competing provisions, insofar as pertinent, read as follows:

Par. 211. Earthenware and crockery ware composed of a nonvitrified absorbent body * * * painted, colored, tinted, stained, enameled, gilded, printed, ornamented, or decorated in any manner, and manufactures in chief value of such ware, not specially provided for, 10 cents per dozen pieces and 50 per centum ad valorem.

Par. 210 as modified by T. D. 49753. * * * Rockingham earthenware, * * * 12½% ad val.

In the proceedings below, representative Exhibits 1 and 2 of the teapots in question and Illustrative Exhibit A, a teapot classified as Rockingham earthenware, were admitted in evidence. The following stipulation, relative thereto, ensued by agreement of counsel for the respective parties:

* * * the body of the teapot represented by Illustrative Exhibit A and the body of the teapots represented by Exhibits 1 and 2 is the same; that there is no

distinction either in composition of the clay or in the method of manufacturing teapots represented by Exhibits 1 and 2 and Illustrative Exhibit A until after the first firing, when the teapots are in the "biscuit" stage; the teapot represented by Illustrative Exhibit A is then dipped into a Rockingham glaze (manganese stain), while the teapots represented by Exhibits 1 and 2 described on the invoice as "mottled" are dipped into a transparent glaze; and before it becomes dry a Rockingham glaze (manganese stain) is applied by sponge to produce the mottled effect.

Referring to Exhibits 1 and 2, the Customs Court, in its opinion, *supra*, said:

* * * These teapots are colored a coffee brown with slightly darker spots, giving a mottled effect. Exhibit 1 has two tan-colored bands around the upper portion of the teapot. These bands are also mottled with a darker shade. The bands are slightly raised above the body of the teapot, indicating that other clay has been added or, as it is called, a body slip has been applied over the red body. Exhibit 2 has one narrow slip band and then upon the upper portion of the teapot the same clay has been superimposed. It also has a mottled tan appearance.

In commenting on Illustrative Exhibit A (and Illustrative Exhibit B, also a teapot classified as Rockingham earthenware), the same court said:

Illustrative exhibits A and B are banded teapots but more of a chocolate color. The color of the bands is dark tan and these bands also are slips of another clay added. These teapots, although slightly darker than exhibits 1 and 2, are not mottled. * * *

Concededly, the merchandise in question does not come within the common meaning of the designation, "Rockingham earthenware." As judicially defined, most recently in *Butler Brothers* v. *United States*, 4 Cust. Ct. 120, C. D. 303 (decided in March, 1940), "the common meaning of the term 'Rockingham earthenware' applies to a certain class of cheap earthenware generally composed of a reddish clay body, but sometimes of a yellow, and less frequently of a white clay body. The body is covered with a brown glaze, the chief coloring ingredient of which is manganese."

It is the appellee's position, successfully maintained in the court below, that the merchandise represented by Exhibits 1 and 2 has acquired a commercial designation as Rockingham earthenware, different from the common signification of that term, and that such designation has been definite, uniform, and general in the trade and commerce of the United States since prior to enactment of the Tariff Act of 1930. The Government argues that the teapots in issue are not encompassed within the common or commercial meaning of the term, "Rockingham earthenware." *Amici curiae* (Lamb & Lerch) have filed a brief in which it is urged that the judicial and legislative history of Rockingham earthenware is such that only those articles that come within the common meaning of the term are classifiable under the Rockingham ware provision.

Following its appraisal of all the evidence in the case, the trial court announced its conclusion as follows:

The weight of the evidence in this case * * * supports the contention of plaintiff [appellee herein] that there is a commercial meaning for the term "Rockingham earthenware" which is different from the common meaning thereof. Not only has it been established by a preponderance of evidence that the commercial meaning thereof includes such class of cheap earthenware as is within the common meaning of the term but, in addition, that it also includes an earthenware body composed of an inexpensive red clay having a lustrous glaze which is variously colored. * * * it is held that there would be included within the designation "Rockingham earthenware" red-clay teapots having a lustrous glaze, colored so as to have a stippled or mottled appearance, and decorated with slips of different clays, as represented by exhibits 1 and 2.

Preliminary to our discussion of the record, it is well to take note of certain essential considerations in a case of this character.

(1) The collector's decision favoring paragraph 210, *supra*, is presumed to be correct until adequate proof to the contrary is of record.

(2) An *eo nomine* provision in the tariff law, such as Rockingham earthenware, is what the commonly accepted meaning of the term happens to be, and where such common meaning is easily and clearly determined through judicial decisions and reports to Congress on the subject by recognized authorities, such findings presumptively include the commercial as well as the common meaning. In other words, the common and commercial meaning of tariff terms are presumed to coincide as Congress legislates in the language of commerce unless otherwise indicated.

(3) This court, while having great respect for the trial court's regard for the evidentiary record, recognizes its duty to review the same and order reversal whenever and wherever the weight of the evidence supports the contrary.

As it is of primary consideration to examine the congressional and judicial history of the legislation involved herein, it is necessary to consult prior tariff acts and applied definitions relative to the meaning of the disputed term, "Rockingham earthenware." The tariff act of 1890 did not specially provide for Rockingham earthenware; however, an importation of such earthenware was before the Board of General Appraisers [now the United States Customs Court] in the case of *Anglo-American Crockery & Glassware Co.*, T. D. 14825, and it was there held to be properly assessed with duty under paragraph 100 of that Act as earthenware, "painted, tinted, stained, enameled, printed, gilded, or otherwise decorated or ornamented in any manner." In that case, it was said:

The same is earthenware, the interior and exterior surface of which are finished with a glazing of a deep brown color of glassy appearance and great brilliancy. It is earthenware tinted or stained.

In the case of *Edward Boote*, T. D. 17728, arising under the tariff act of 1894 (Rockingham earthenware not specifically provided for), Rockingham earthenware was described in the following language:

This ware, according to the evidence in the case, is manufactured by first molding the articles from clay and firing the same to produce the biscuit ware. This biscuit ware is then coated with a mixture of calcined feldspar, ground flint, and manganese, and the articles when so coated are called enamel-painted, according to the testimony of the importer.

The ware, after being so coated, is again fired and the coating fused, producing a brilliant glassy dark brown or black enameled surface to the ware, differing entirely in character, color, density, and material from the clay body. It is known specifically in trade as brown Rockingham ware, and is earthenware enameled and tinted, and is not the class of ware commercially known as common brown earthenware.

In *Masson et als.* v. *United States*, 3 Ct. Cust. Appls. 420, this court was concerned with the proper dutiable classification of a quantity of decorated earthenware consisting of teapots imported under the provisions of the tariff act of 1909. The importer in that case sought to establish that the merchandise was Rockingham earthenware and as such dutiable under the specific enumeration therefor found in paragraph 92 of the act of 1909. It was contended on behalf of the importers therein "that the articles now in question have for many years been bought and sold in the trade of this country under the name of Rockingham earthenware, and have thereby acquired a commercial designation as such which is definite, uniform, and general in character throughout the domestic trade * * *." In its opinion in that case, this court discussed the *Anglo-American Crockery* and *Edward Boote* cases, *supra*, and also the case of *Wilfred Schade & Co.*, T. D. 21320, 1 Treas. Dec. 1221, which arose under the tariff act of 1897 which made specific provision for Rockingham earthenware. Describing Rockingham earthenware in the *Schade* case, the Board of General Appraisers said:

It is the highly glassy, tinted glaze that gives Rockingham ware its distinctive name and character. It may be decorated or tinted earthenware, but so long as it has only the Rockingham glaze it is covered by the special provision for Rockingham earthenware.

In sustaining the decision of the board in the *Masson* case, *supra*, we quoted from its opinion, reported below as *Robert B. Ways*, T. D. 32271, 22 Treas. Dec. 270, as follows:

The testimony, we think, conclusively, certainly by a fair preponderance, shows that the term "Rockingham ware" originally applied to a certain class of cheap earthenware manufactured in England, and, in more recent years, in the United States; that it is generally made of a reddish clay body, but sometimes of a yellow, and less frequently of a white clay body; that this body is covered with a brown glaze, the chief coloring ingredient of which is manganese. Being guided by this testimony, we reach the conclusion that it is the glaze with which the body of the ware is covered that gives to it its distinctive name and character.

We agreed with the board's conclusions and were thus not convinced that the importer had proved a commercial meaning which differed from the commonly accepted definition of the designation.

The Summary of Tariff Information, 1920, at page 144, states as follows with regard to the specific provision for Rockingham earthenware:

* * * Rockingham ware imported from England is of cheap brown, yellow, or reddish clay, often elaborately decorated; the domestic make is of yellow or buff clays. It is covered with a rich brown glaze which gives its distinctive name, manganese being the chief color ingredient. Except for its glaze, it is the same as other common ware made of domestic clays. It is used largely for teapots.

To the same effect is the definition given in the Dictionary of Tariff Information, 1924, which was cited and followed in *W. X. Huber Co.* v. *United States*, T. D. 44059, 57 Treas. Dec. 835, a case decided under the Act of 1922.

A Summary of Tariff Information, issued in 1929 (Schedule 2, page 471) by the United States Tariff Commission, described Rockingham earthenware as "a comparatively inexpensive type of earthenware usually in the form of teapots. It is composed of red, brown, or yellow clay covered with a glaze varying from an opaque brown to almost black, which distinguishes it from other types of earthenware." In regard to this report, *amici curiae* states:

* * * This report was compiled for the use of the Committee on Ways and Means, House of Representatives (see fly leaf), at the time the Tariff Act of 1930 was being written by Congress.

This report was made after investigation by the Tariff Commission and its investigation showed what the true and exact meaning of Rockingham ware was in the United States prior to the Tariff Act of 1930. It was not biased or colored in any sense and was taken directly from the trade.

A further report by the Tariff Commission was compiled in 1938 with respect to the trade agreement with the United Kingdom, T. D. 49753, *supra*, and it was there stated (Vol. III, Schedule 2, page 38), substantially as before, that "Rockingham earthenware is a variety of coarse, relatively inexpensive earthenware made of a red-burning clay covered with opaque glaze varying in color from brown to almost black; it is distinguished from other types of earthenware by its glaze which is produced by adding manganese compounds to a so-called lead glaze." The brief of *amici curiae* comments as follows relative to the Commission's report of 1938:

* * * It does not seem possible that a different commercial meaning could have existed without the Tariff Commission knowing about it. Their investigations are made in the trade and commerce of the United States, and if a "definite," and "general" and "uniform" definition of Rockingham ware existed in the trade and commerce of the United States, that was different from the common meaning as determined by the courts and adopted by Congress they would have known of it. * * *

Again, in a Tariff Commission Report, Summaries of Tariff Information, Volume II, Part I, written in 1948, on page 145, we find:

Rockingham earthenware is a coarse earthenware; it has a body made with a red-burning clay, and an *opaque, manganiferous lead glaze*, varying in color from brown to almost black. [Italics quoted.]

Therefore, from 1929 to 1948, which covers the entire life of the Tariff Act of 1930, the Tariff Commission has consistently defined Rockingham ware according to the common, adjudicated and legislated meaning. * * *

It is thus readily apparent from the foregoing that the term "Rockingham earthenware" has a well established, well defined meaning which has been consistently applied over a long period of years. It has repeatedly been held to have application to a cheap, relatively inexpensive earthenware, the body of which is generally of red clay and less often of yellow or white clay. The body is covered with a brilliant opaque brown to almost black glaze, the chief coloring ingredient being manganese. It is said to be recognized and particularly distinguished by its Rockingham glaze—the manganese stain.

Congress in enacting and re-enacting the Rockingham earthenware provision of the various tariff acts, including the Tariff Act of 1930 with its subsequent modifications, did so at a time when the term in question had previously been interpreted by the courts and further defined by the United States Tariff Commission in its reports to Congress and the President. However salient such a fact may seemingly be, it does not, in itself, present sufficient justification upon which to conclusively presume that Congress intended to restrict the classification of Rockingham earthenware to its common (and presumptively commerical) meaning. Despite the knowledge it possessed at the time of enacting the Act of 1930, Congress provided without qualification for Rockingham earthenware, and there is no clear manifestation of an intention to adopt the established common meaning to the exclusion of proof indicative of a true commercial designation differing therefrom. See *Cadwalader* v. *Zeh*, 151 U. S. 171. In *Wanamaker* v. *United States*, 13 Ct. Cust. Appls. 93, T. D. 40939, this court stated:

The rule that, by the reenactment in the same language of a prior statute, a former judicial interpretation thereof is thereby approved, can apply so far only as the common meaning is concerned. It can not apply to commercial meaning, because that must always be established, like any other fact, by competent evidence introduced in the case in which such meaning is in issue. [citing cases.]

We must, therefore, rest our ultimate decision on the legal sufficiency of the evidence offered to sustain the position taken by the importer. In this respect, the importer's burden of proof is recognized to be a difficult one and is satisfied only by clearly showing by a competent preponderence of the evidence that there is a commercial designation for Rockingham earthenware which is definite, uniform, and general throughout the trade and commerce of the United States

and that such meaning has been in effect since prior to the passage of the Tariff Act of 1930. In resolving this question, the findings by the court below will not be disturbed unless such findings are manifestly contrary to the weight of the evidence, due regard being given to the trial court's opportunity, as in this instance, to observe the witnesses before it.

The major distinction between Illustrative Exhibits A and B on the one hand and Exhibits 1 and 2 on the other is found in the glaze covering the body of the teapot. In the former, as evidenced by the stipulation, the body of the teapot is completely covered with the Rockingham manganese glaze while the latter is covered with a transparent glaze, not containing manganese, and thereafter the mottled or spotted effect is produced by applying a Rockingham glaze (manganese stain) by sponge. At the trial, the importer introduced into evidence Illustrative Exhibits C through H alleging that the teapots represented thereby, as well as Exhibits 1 and 2, were bought and sold in the wholesale trade as Rockingham earthenware prior to enactment of the Tariff Act of 1930. Five witnesses testified on behalf of the importer. Each of these witnesses expressed the opinion that the term "Rockingham earthenware" was not limited in its commercial definition to the common meaning ascribed to such term by the court in the *Butler Brothers* case, *supra*. In other words, all of the appellee's witnesses disagreed with the adjudicated common meaning of the term in question as being representative of the commercial meaning in the trade. Four of the importer's witnesses were well qualified, their commercial experience antedating enactment of the Tariff Act of 1930, and these witnesses had collectively bought and sold at wholesale in the United States and bought at wholesale abroad. The remaining witness testifying on behalf of the importer had bought at wholesale abroad and sold at wholesale throughout the United States, his experience in such transactions commencing in 1945. The importer's witnesses each agreed in turn that Rockingham earthenware was known in the trade as having a red clay body. Two of the witnesses stated, in effect, that if the ware had a red clay body it was Rockingham regardless of other considerations such as the glaze. Two other witnesses testified that in addition to the basic red body the ware was generally inexpensive and could be of a variety of glazes. The remaining witness for the importer was of the opinion that the glaze was of no significance except by way of decoration. On direct examination of these witnesses, Exhibits 1 and 2 and C through H were variously identified by them as being Rockingham earthenware and when asked whether the commercial meaning alluded to was definite, uniform, and general throughout the trade of the country, each witness expressed an opinion in the affirmative.

The four witnesses offered on behalf of the Government testified in substance and net effect, though at times they appeared uncertain, that there was no trade distinction between the commercial and common meaning of the term "Rockingham earthenware" as the latter term was adjudged by the court in the *Butler Brothers* case, *supra.* One of these witnesses, a ceramic engineer, stated that he had been familiar with Rockingham earthenware since 1915 and had discussed it with other ceramic engineers. Though the witness did not produce such ware in the course of his employment, he stated that he knew how it was made and thereafter, upon inquiry of counsel on direct examination, proceeded to differentiate Rockingham ware from other ware by its manganese glaze covering the body of the teapot. He further stated that the importer's Exhibits 1 and 2 were not Rockingham because "they have a transparent glaze over the entire assembly, and there is no manganese in that glaze." It is evident from the record, however, that this witness was without commercial experience, but that fact, while manifestly affecting the weight to be assigned to his testimony, does not operate to completely nullify its competency as it appears that in his profession the witness would likely observe changes in the prevailing commercial definition of Rockingham ware because, among other things, such ware was in direct competition with the ware manufactured by his company. Another Government witness, though never having bought or sold Rockingham earthenware in the trade and commerce of the United States, stated that he was familiar with such ware since prior to 1930 because the firm of which he was General Manager and Treasurer sold china teapots likewise in direct competition with Rockingham earthenware. He stated, as did the ceramic engineer, that Exhibits 1 and 2 were not Rockingham earthenware because they were not covered "with a brown lustrous manganese glaze" but were instead "covered with a clear transparent glaze." The lack of commercial qualifications of this witness to express an opinion on the question of commercial designation quite obviously bears on the reliability of his testimony, and accordingly it must be so weighed. The remaining Government witnesses were amply qualified domestic commercial witnesses with long experience. As aforesaid, these two witnesses stated that there was no commercially differing definition for Rockingham earthenware in the trade than that well established common signification for such ware set forth in *Butler Brothers* v. *United States, supra.* However, on further examination by counsel, witness Tycer for the Government identified Exhibits 1 and 2 as being commercially comprehended in the trade as Rockingham earthenware, but later he changed his opinion. The Government's witness Leon likewise appeared confused in his testimony stating that the importer's Exhibit C was being sold in the trade as Rockingham earthenware and

that he personally had accepted such ware as Rockingham although he didn't agree that Exhibit C did, in fact, represent Rockingham earthenware.

While testimony introduced in opposition to establishment of a commercial designation differing from the common meaning may be weak, or not responsive, or inconclusive, such fact does not affirmatively operate to prove, as in the instant case, the validity of the importer's position. The effectiveness of the evidence in each case of commercial designation is ultimately decisive of the issue, but it is an absolute prerequisite for the party assuming to prove the affirmative that such evidence be legally persuasive of a commercial meaning which is definite, uniform, and general throughout the trade.

The court below, in making its analysis of the testimony, was satisfied that the importer's witnesses had bought and sold throughout the entire country since prior to 1930 (with the exception of one witness) and that their respective opinions would be representative and reflect prevailing views on the subject. Following a summary of the evidence offered at the trial, the court below said:

* * * It is in no way refuted by any of the witnesses testifying in this case that the cheap red or buff earthenware with a glaze of high intensity is not Rockingham earthenware, as variously defined, but it is contended with sincerity and justification as would appear from the evidence produced by these reputable businessmen that in trade and commerce throughout the United States certain cheap red-clay ware having glazes the color of which is produced by substances other than manganese is definitely known as "Rockingham earthenware," and such knowledge in the trade is general and uniform throughout the country, and not partial, local, or personal.

* * * * * * *

* * * it is held that there would be included within the designation, "Rockingham earthenware" red-clay teapots having a lustrous glaze, colored so as to have a stippled or mottled appearance, and decorated with slips of different clays, as represented by exhibits 1 and 2.

It is entirely clear that Exhibits 1 and 2 are covered by a transparent glaze and thereafter merely mottled by the manganese stain. Whether, with the addition of the slips of clay, the body of the teapot represented by Exhibits 1 and 2 is lustrous, brilliant, or otherwise is not adequately brought out in the testimony, but in any event the trial court was convinced by the evidence before it that in the wholesale trade and commerce of the United States, prior to 1930, the commercial meaning of Rockingham earthenware "was not confined to a glaze having manganese as the chief coloring ingredient." There is unquestionably evidence in support of this finding.

For the reasons hereinbefore stated, the decision of the United States Customs Court is *affirmed.*

WORLEY, J., concurs in the conclusion.

JOHNSON, J., dissents.